**Case No. 25-3174**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

**JUSTIN SPIEHS**,

*Plaintiff-Appellant,*

v.

**KATHLEEN MORGAN** *et al,*

*Defendants-Appellees,*

---

On appeal from the United States District Court
for the District of Kansas
The Honorable Judge Julia A. Robinson
Case No. 5:24-cv-04016-JAR

---

**OPENING BRIEF OF APPELLANT**

---

| | |
|---|---|
| Linus L. Baker<br>6732 West 185th Terrace<br>Stilwell, Kansas 66085<br>(913) 486-3913<br>linusbaker@prodigy.net | |
| *Attorney for Justin Spiehs*<br><br>*Oral Argument is Requested* ||

November 10, 2025

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES........................................................2

    I. First Amendment - Forum Analysis and Level of Scrutiny.....................2

    II. First Amendment - Content and Viewpoint Discrimination...................2

    III. First Amendment - Facial Overbreadth and Vagueness .....................2

    IV. First Amendment - As-Applied Constitutional Violations ..................2

    V. Standing for Prospective Relief .........................................3

    VI. Qualified Immunity .....................................................3

    VII. Procedural Due Process ................................................3

    VIII. Equal Protection ....................................................3

STATEMENT OF THE CASE .........................................................4

    II. May 17 2023 Event......................................................5

    III. June 11 2023 Event....................................................6

    IV. Subsequent Incidents (Late 2024 – March 2025) .........................8

    V. Library Policies and Authority......................................... 11

    VI. PITS / Incident Tracking System ...................................... 13

    VII. Video Evidence ...................................................... 15

    VIII. Intended Future Conduct............................................. 18

ARGUMENT ..................................................................... 18

I. THE DISTRICT COURT'S REFUSAL TO VIEW PLAINTIFF'S............... 18
TIMESTAMPED VIDEO EVIDENCE WAS FACTUALLY FALSE AND ..... 18
LEGALLY ERRONEOUS............................................................ 18

    A. The Court's Rationale Was Factually False......................... 18

    B. The Video Record the Court Refused to View ...................... 19

        1. Police Repeatedly Declined To Enforce The "No-Sign " Rule ....... 19
    C. The Court Applied a One -Sided Evidentiary Standard..................... 20

    D. Legal Error Under *Scott*, *Tolan*, and *Anderson* ................................. 20

    E. The Error Was Repeated Across Multiple Filings ............................... 21

    F. Conclusion ........................................................................................ 21

3. THE DISTRICT COURT 'S FORUM MISCLASSIFICATION INFECTED

ITS ENTIRE ANALYSIS ................................................................................ 21

    A. The Lawrence Public Library Is a Designated Public Forum ............ 22

    B. The District Court Failed to Conduct the Required Factual Inquiry . 23

    C. Designated Forum Status Demands Strict Scrutiny ........................... 24

    D. The District Court Applied the Wrong Scrutiny and Wrong Burden. 25

    E. Correct Classification Compels Reversal .......................................... 25

4. THE "BLANK PAPER " INCIDENT EXPOSES FATAL

CONSTITUTIONAL DEFECTS ......................................................................... 26

    A. Blank Cardboard Triggered Enforcement; Actual Protest Did Not .. 26

    B. No Reasonable Person Could Predict That Blank Paper Violates .... 27

    C. The Policy Suppresses Substantial Protected Expression ................. 28

    D. Enforcement Reveals Content and Viewpoint Discrimination .......... 29

    E. Blank Paper Is the Reductio ad Absurdum ....................................... 30

    F. The Policy Cannot Survive Any Level of Scrutiny ............................ 31

        A. The Library Secretly Banned Plaintiff Without Any Process ....... 32

        B. The District Court Never Addressed the Claim ........................... 33

        C. The Secret -Ban Regime Violated Clearly Established Law ......... 33

        D. Remedy: Reversal or, At Minimum, Remand for Adjudication .... 34

        E. Qualified Immunity Cannot Shield Secret Bans ........................... 34

V. THE LIBRARY RETALIATED AGAINST DR. SPIEHS FOR HIS

PROTECTED SPEECH .................................................................................... 35

    A. Governing standard ......................................................................... 35

    C. Adverse Action ................................................................................. 36

    D. Causal Connection .......................................................................... 37

    E. Clearly Established Law .................................................................... 38

    F. Conclusion ....................................................................................... 39

VI. EQUAL PROTECTION AND COMPARATOR ANALYSIS..................... 39

    Conclusion ................................................................................. 41

VII. THE LIBRARY'S BEHAVIOR AND FREE -SPEECH POLICIES
BROADLY .................................................................................. 42

    1. "Behavior That Disturbs Others '
Use And Enjoyment " ................................................................. 50

    "Offensive Conduct "................................................................... 50

    2. "Patrons Must Follow The Reasonable Direction Of Staff " ............... 51

    3. "Failure To Comply … May Result In Removal Or Suspension " ....... 51

    4. "Protesting , Sign -Holding , Or Expressive Conduct … Where It ...... 51

    May Interfere With Study Or Enjoyment " ...................................... 51

    5. "Patrons May Not Act As Public Speakers Or Engage In.................. 52

    Expressive Activity Inside Library Buildings "................................. 52

    6. Outdoor -Only Rule ("Free -Speech Activities " Confined To Sidewalks
Or Plazas ) ................................................................................ 52

VIII. PAST INJURY, ONGOING INJURY, AND REDRESSABILITY ......... 55

    A. Injury.................................................................................... 55

    B. Ongoing and Predictive Harm ................................................. 56

    C. Traceability and Non -Self-Inflicted Harm ................................. 56

    D. Redressability and Nominal Damages ...................................... 57

IX. QUALIFIED IMMUNITY AND POLICY RESPONSIBILITY ................. 57

    A. The Violations Were "Obvious Cases " Under
Clearly Established Law............................................................. 57

    B. Defendants Acted Ultra Vires Qualified Immunity
Does Not Apply ........................................................................ 58

    C. Inconsistency Between Qualified -Immunity And Monell  Rulings ... 59

D. CONCLUSION......................................................................... 59

ORAL ARGUMENT STATEMENT ................................................... 62

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)................................ 64

CERTIFICATE OF DIGITAL SUBMISSION ..................................... 65

CERTIFICATE OF SERVICE............................................................ 66

ADDENDUM............................................................................A-1

District Court's Memorandum Ruling (9/3/2025) ...........................A-1

Final Judgment (9/3/2025) .......................................................A-28

**TABLE OF AUTHORITIES**

Cases

*A.M. v. Holmes*, 830 F.3d 1123 (10th Cir. 2016) ........................................ 41, 42

*Acosta v. City of Costa Mesa*, 718 F.3d 800 (9th Cir. 2013) ............................ 59

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................... 22

*Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998) .................................... 34

*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*,
226 F.3d 1138 (10th Cir. 2000)............................................................ 61

*Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015) ...................... 53

Brammer-Hoelter v. Twin Peaks Charter Acad.,
492 F.3d 1192 (10th Cir. 2007)............................................................ 34

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) .................... 33

*Brown v. Louisiana*, 383 U.S. 131 (1966) ........................................... 23, 30, 47

*Buell Cabinet Co. v. Sudduth*, 608 F.2d 431 (10th Cir. 1979)......................... 61

*Carey v. Piphus*, 435 U.S. 247 (1978)................................................................ 59

*Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011)................... 34

*Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.*,
767 F.2d 1232 (7th Cir. 1985)............................................................. 24

*City of Houston v. Hill*, 482 U.S. 451 (1987) ................................................... 36

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994)............................... 27, 32, 50, 51, 55

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)....................................... 60

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ........................... 34

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ...................................... 28, 47

*Czaplinski v. Ballard*, No. 24-2128, 2025 WL 2986832
(D. Kan. Oct. 23, 2025) ...................................................... 39

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012)................... 23, 27, 30, 32, 49, 51, 52, 59, 60, 62

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) .................... 56

*FEC v. Cruz,* 596 U.S. 289 (2022) ................................................... 57

*First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*,
308 F.3d 1114 (10th Cir. 2002)............................................. 49, 53, 55

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ................................... 58

*Foote v. Spiegel*, 118 F.3d 1416 (10th Cir. 1997)................................. 62

*Forsyth County v. Nationalist Movement,* 505 U.S. 123 (1992) ............... 52, 55

*Good News Club v. Milford Cent. Sch.,* 533 U.S. 98 (2001)........................... 25

*Goss v. Lopez*, 419 U.S. 565 (1975)...................................... 21, 34, 61

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)............................... 28, 46, 53

*Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366 (3d Cir. 1990).................... 24

*Guffey v. Wyatt*, 18 F.3d 869 (10th Cir. 1994) ................................... 38

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ....................................... 59

*Hope v. Pelzer*, 536 U.S. 730 (2002) ...................................... 35, 40, 62

*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001) ................................. 24

*Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46 (1988) .................................. 37

*Ison v. Madison Local Sch. Dist. Bd. of Educ.*,
3 F.4th 887 (6th Cir. 2021) ...................................................... 53

*Kerr v. Polis*, 930 F.3d 1190 (10th Cir. 2019) .................................................. 61

*Kreimer v. Bureau of Police for Town of Morristown*,
958 F.2d 1242 (3d Cir. 1992) ...................................................... 34, 37, 49, 51, 62

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) ................................................................................. 23

*McCullen v. Coakley*, 573 U.S. 464 (2014) ........................................... 50, 54, 55

*Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018) ....................... 46

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ...................... 63

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ................................................................................. 36

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ............................ 52

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986) ...................................... 59

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) ......................................................................... 25, 26, 33, 50

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) ....................................... 35

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .................................................................... 25, 31, 55

*Schmidt v. Huff*, No. 24-2422-JAR,
2025 WL 3221052 (D. Kan. Aug. 14, 2025) ............................................. 39, 59

*Scott v. Harris*, 550 U.S. 372 (2007) .............................................................. 21

*Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022) ........................................ 23

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) ........................... 52

*Smith v. Albany County Sch. Dist. No. 1,*
121 F.4th 1374 (10th Cir. 2024) .................................................................. 56

*Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001) ................................ 36

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...................................... 37

*Spence v. Washington*, 418 U.S. 405 (1974)................................... 45

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ....................... 57

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......................... 4, 57

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949) ..................................... 44, 52

*Texas v. Johnson*, 491 U.S. 397 (1989) ...................................... 36, 37

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ..... 4, 37, 58

*Tolan v. Cotton,* 572 U.S. 650 (2014) ............................................. 22

*United States v. Grace,* 461 U.S. 171 (1983)....................................... 45, 47, 53

*Utah Gospel Mission v. Salt Lake City Corp.*,
425 F.3d 1249 (10th Cir. 2005)........................................................ 49

*Uzuegbunam v. Preczewski*, 592 U.S. 111 (2020)............................................ 58

*Van Deelen v. Johnson*, 497 F.3d 1151 (10th Cir. 2007).......... 35, 36, 39, 48, 62

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ..................................... 40

*Vollmecke v. Independence Sch. Dist.*, 2024 WL 1363456
(W.D. Mo. 2024) ....................................................................... 35

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ........................................ 50

*Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000) ................................ 36, 39, 56

Constitutional Provisions

U.S. Const. amend. I........................................................................ 4, 5

U.S. Const. amend. XIV........................................................4

Statutes

28 U.S.C. § 1291...............................................................4

42 U.S.C. § 1983...............................................................4

Rules

Fed. R. App. P. 32 ............................................................6

Other Authorities

David R. Dewberry, First Amendment Audits: Comparing the Arguments for the Right to Record on the Street to Arguments in Case Law, 57 Argumentation & Advocacy 85 (2021) ........................................ 37

corporate disclosure statement

Consistent with Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant is not a corporation and that it neither issues stock nor has a parent corporation

## STATEMENT OF RELATED APPEALS

There are no related appeals.

**INTRODUCTION**

This is a 42 U.S.C. § 1983 action challenging the Lawrence Public Library's policies prohibiting patrons from "holding or carrying signs," "protesting," and engaging in other "expressive conduct or speech" inside the library. Between May 2023 and March 2025, Dr. Justin Spiehs entered the library on multiple occasions and silently held signs with political messages. Each time, library staff instructed him to remove his signs or leave, and when he declined, staff called police to remove him. The library imposed escalating suspensions through its Patron Incident Tracking System (PITS) without providing Dr. Spiehs prior notice or opportunity to be heard.

Dr. Spiehs brought facial and as-applied First Amendment challenges alleging content and viewpoint discrimination, retaliation, vagueness, and overbreadth. He also asserted Fourteenth Amendment procedural due process and equal protection claims. Video evidence shows that on each occasion, Dr. Spiehs stood silently, no library patron complained about his signs, and library operations continued normally. On December 1, 2024, library staff removed Dr. Spiehs for holding blank cardboard. Library staff permitted other patrons to display papers and flags while disciplining Dr. Spiehs for substantially identical conduct.

The district court granted defendants' motion for summary judgment and denied plaintiff's motion for partial summary judgment. (Memorandum and Order dated September 3, 2025).

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgment on September 3, 2025, and Dr. Spiehs timely filed his appeal notice on October 2, 2025. AA Vol 2-110.[1]

---

[1] "AA#" denotes the page(s) in Appellant's Appendix which contains two volumes.

The issues presented are:

## I. **First Amendment - Forum Analysis and Level of Scrutiny**

Whether the district court erred by classifying the Lawrence Public Library as "at least a designated public forum" but applying intermediate scrutiny to restrictions on silent sign-holding, when libraries are designated public forums where content-based restrictions must satisfy strict scrutiny.

## II. **First Amendment - Content and Viewpoint Discrimination**

Whether the Library's policies are content-based and viewpoint-based on their face and as-applied, requiring strict scrutiny under *Reed v. Town of Gilbert,* where the policies prohibit "protesting" while permitting supportive expression, allow Library-sponsored speakers to engage in identical conduct prohibited to ordinary patrons, and were selectively enforced based on message content.

## III. **First Amendment - Facial Overbreadth and Vagueness**

Whether the Library's Free Speech Activities Policy is unconstitutionally overbroad and vague on its face because it prohibits "holding or carrying signs," "protesting," "acting as a public speaker," and other undefined terms that sweep in vast amounts of protected expression based on subjective standards.

## IV. **First Amendment - As-Applied Constitutional Violations**

Whether the Library's prohibition on "holding or carrying signs" is unconstitutional as-applied to Dr. Spiehs' silent sign-holding when defendants produced no evidence of actual disruption, the prohibition is not narrowly

tailored, and silent sign-holding in public forums has been clearly protected since *Tinker v. Des Moines*.

## V. **Standing for Prospective Relief**

Whether the district court erred in dismissing Counts 1 and 2 for lack of standing by applying an incorrect "subjective chill" test, when Dr. Spiehs' intent to engage in restricted conduct and history of repeated enforcement demonstrates a credible threat of future enforcement sufficient for standing under *Susan B. Anthony List v. Driehaus* 573 U.S. 149 (2014).

## VI. **Qualified Immunity**

Whether the district court erred in granting qualified immunity without addressing whether the law was clearly established, when the right to engage in peaceful, silent protest in a designated public forum has been clearly established and officials cannot receive qualified immunity for enforcing facially unconstitutional policies.

## VII. **Procedural Due Process**

Whether the Library's summary suspension procedure violates procedural due process where Dr. Spiehs received no advance notice of suspensions, the PITS imposes escalating discipline without notice or hearing, and the Library provides no mechanism to challenge suspensions.

## VIII. **Equal Protection**

Whether the district court erred in granting summary judgment on the equal-protection claim when Dr. Spiehs identified specific comparators who engaged in substantially similar conduct but were not disciplined, creating a genuine

issue of material fact regarding discriminatory intent, and the physical distinctions cited by the court are immaterial to the Library's asserted interest in preventing disruption.

STATEMENT OF THE CASE

## Parties and Roles

Appellant Justin Spiehs has a doctorate in lifespan human development and a master's degree in marriage and family therapy, both from Kansas State University, and a bachelor's degree in human services with emphasis in addiction counseling from Washburn University. He previously worked in Kansas as a licensed marriage and family therapist and licensed addiction counselor. He was an assistant professor of family and human services at Washburn University and served honorably for nine years in the U.S. Navy submarine service. (AA Vol. 1-156; AA Vol. 1-197). Dr. Spiehs began reporting on the City of Lawrence as a citizen journalist in April 2022. (AA Vol. 1-156; AA Vol. 1-197). Dr. Spiehs utilizes his encounters, as well as others, to report on his observations and at times to question other individuals in real time for reporting purposes. He publishes using YouTube as his medium. (AA Vol. 1-156; AA Vol. 1-197).

The Public Library of the City of Lawrence (the Library) is a municipal public body and a quasi-political subdivision of the City of Lawrence, Kansas. (AA Vol. 1-156; AA Vol. 1-197). The Board of Directors of the Free Public

Library of the City of Lawrence is a governing body appointed by the Lawrence City Commission and funded by the City under Charter Ordinance No. 16. (AA Vol. 1-156; AA Vol. 1-197).Kathleen Morgan is Director of Development and Community Partnerships for the Library and participated in Dr. Spiehs's removal on May 17 2023. (AA Vol. 1-156; AA Vol. 1-197). Marc Veloz was a Community Resource Specialist for the Library and participated in Dr. Spiehs's removal on May 17 2023. (AA Vol. 1-156; AA Vol. 1-197). Sara Mathews, Heather Kearns, Karen Allen, Lauren Taylor, Tristan Star, and Polli Kenn were Library employees present and participating in Dr. Spiehs's removal on May 17 2023, June 11 2023, or both. (AA Vol. 1-156; AA Vol. 1-198).

## II. May 17 2023 Event

On May 17 2023, the public was invited to a Library event on "gender markers" related to legal documents. Dr. Spiehs attempted to enter with a sign reading "If you have a dick then you are not a chick." (AA Vol. 1-157; AA Vol. 1-198). Dr. Spiehs's friend attempted to enter with a sign stating "God didn't get it wrong. There are only 2 genders," with male and female gender signs drawn on it. (AA Vol. 1-158; AA Vol. 1-198). Dr. Spiehs did not plan on verbally communicating anything but intended to sit silently while displaying those signs. Upon entry, he and his friend initially stood silently at the entrance of the Library auditorium where the event was to be held. (AA Vol. 1-158; AA Vol. 1-198).

When the Library auditorium doors opened for the public, Dr. Spiehs attempted to enter but was confronted by employee Marc Veloz, who attempted to stop him. (AA Vol. 1-158; AA Vol. 1-198). The doors were then locked from the outside with attendees inside, further preventing entry. Heather Kearns, Tristan Star, Marc Veloz, Kathleen Morgan, Lauren Taylor, Sarah Mathews, and Karen Allen gathered around Dr. Spiehs and his friend, physically preventing entry. (AA Vol. 1-158; AA Vol. 1-198).

Dr. Spiehs witnessed these individuals permit a woman to block him from entering and call the Lawrence City Police to complain of a violation. (AA Vol. 1-159; AA Vol. 1-198). Those individuals told Dr. Spiehs he could not enter the meeting with his sign; Veloz said his signs made others feel "uncomfortable." (AA Vol. 1-159; AA Vol. 1-198). Kathleen Morgan and Heather Kearns told Dr. Spiehs he could not enter because it was a private event. When police arrived, Morgan told them Dr. Spiehs was to be removed because of his signs, and he was forced to leave. (AA Vol. 1-150; AA Vol. 1-198).

## III. June 11 2023 Event

On June 11 2023, the Library hosted "Deja's Reading Rainbow," a public event featuring drag performer Deja Brooks reading stories about love, friendship, and belonging. (AA Vol. 1-159; AA Vol. 1-199). Dr. Spiehs and three friends planned to attend the event displaying their signs silently. (AA Vol. 1-158; AA Vol. 1-199). Dr. Spiehs entered the Library with signs reading "This

is Wrong" and "Stop Grooming Kids." Another sign read "Deja is a Soul-less Parasite." (AA Vol. 1-159; AA Vol. 1-199).

When Dr. Spiehs entered, Tristan Star told him "We've been over this before with the signs," and insisted he could not attend if a disturbance was made. Dr. Spiehs replied he would not be a disturbance and waited outside the auditorium. (AA Vol. 1-160; AA Vol. 1-199). While waiting for the doors to open, Star told Dr. Spiehs "I know you want to be internet famous and all that," and that he wouldn't allow signs that "make people feel uncomfortable," adding "we aren't a public library technically." (AA Vol. 1-160; AA Vol. 1-199).

Tristan Star, Karen Allen, Polli Kenn, and Phillip Howard stood together reviewing paperwork; afterward Allen, Kenn, and Howard hugged. When the doors opened, Dr. Spiehs entered with his signs and sat with his group. (AA Vol. 1-158; AA Vol. 1-199). As they sat waiting for the start of the event, Tristan Star and Karen Allen continued to group with the other employees looking at a paper. Dr. Spiehs had placed his signs in the purse of one of his friends. When the event started they all quietly and silently displayed their signs. (AA Vol. 1-160; AA Vol. 1-199).

The performer going by the stage name "Deja Brooks" demanded that they put their signs down. In response, Tristan Star again confronted Dr. Spiehs and claimed that he was being disruptive when he had not said anything and was sitting calmly and quietly. (AA Vol. 1-161; AA Vol. 1-199).

The individuals Dr. Spiehs named previously were close by and watched while this occurred. Tristan Star told Dr. Spiehs he had to leave or he would call the police and have him cited for trespass. (AA Vol. 1-161; AA Vol. 1-199). Up to that point neither Dr. Spiehs nor his friends had said anything. (AA Vol. 1-161; AA Vol. 1-199).

Then two Lawrence City police officers entered the Library auditorium. (AA Vol. 1-161; AA Vol. 1-200). Because of the demands of Tristan Star and Karen Allen, Dr. Spiehs felt he had no choice under threat of arrest but to leave involuntarily. (AA Vol. 1-161; AA Vol. 1-200). Dr. Spiehs left under duress and threat of arrest. (AA Vol. 1-161; AA Vol. 1-200).

Appellees Brad Allen and Kathleen Morgan do not claim they were given authority by the Board of Library Trustees to create or modify Library policy regarding speech or conduct. (AA Vol. 2-13; AA Vol. 1-108; 1-114). Appellees do not say when Morgan's no-sign or anti-protest prohibitions began or why. (AA Vol. 2-13; AA Vol. 1-108; 1-114).

## IV. Subsequent Incidents (Late 2024 – March 2025)

On November 25 2024, Dr. Spiehs silently held a paper stating "Free Speech Died Here Ask Me How," while another patron, Michael Eravi, displayed the Library's Free-Speech Policy. (AA Vol. 1-164; AA Vol. 1-202). Facilities Manager Jon Ratzlaff demanded that Dr. Spiehs stop displaying the paper, called police, and the officer told Dr. Spiehs he must leave. (AA Vol. 1-

164; AA Vol. 1-202). Ratzlaff did not ask Michael Eravi to leave, and police said they would simply file a report for the city prosecutor. (AA Vol. 1-164; AA Vol. 1-202). The PITS report for that date recorded a "suspension" and detailed the encounter in which officers escorted Dr. Spiehs out. (AA Vol. 1-165; AA Vol. 1-202).

On November 26 2024, Dr. Spiehs returned, again silently holding the same sign and wearing a shirt with the same message. Police again instructed him to leave. (AA Vol. 1-165; AA Vol. 1-202). The PITS database again labeled him a "perpetrator" and noted: "Suspension – Justin Spiehs (not informed)." (AA Vol. 1-165; AA Vol. 1-202). A second PITS entry described the same incident and again cited him for "disregarding the reasonable direction of staff." (AA Vol. 1-164; AA Vol. 1-202).

On December 1, 2024, David Basten entered carrying a sign, "This public library should be defunded for constitutional violations!" Tristan Star told him to leave; he refused. Brad Allen then called police. (AA Vol. 1-165; AA Vol. 1-202). That same day Dr. Spiehs entered with a blank piece of cardboard. Ratzlaff declined to speak to him, claiming "we have twice told him no signs." Police were called and refused to intervene. (AA Vol. 1-165; AA Vol. 1-202). PITS entries for December 1 2024 recorded both Basten and Dr. Spiehs for "disregarding the reasonable direction of staff," each given a suspension. (AA Vol. 1-165; AA Vol. 1-202).

On December 9 2024, the Library displayed transgender and LGBTQ pride flags. Dr. Spiehs silently held a "Don't Tread on Me" flag while Michael Eravi wore a pride flag as a cape. (AA Vol. 1-166; AA Vol. 1-202). Security guard Darin McQueen told Dr. Spiehs he was not permitted to display his flag because it was "expressive conduct." He did not object to Eravi's flag. (AA Vol. 1-166; AA Vol. 1-202). The PITS entry again listed Dr. Spiehs as "perpetrator" for "disregarding the reasonable direction of staff." (AA Vol. 1-165; AA Vol. 1-202).

On March 27 2025, Dr. Spiehs attended a public event carrying a sign reading "This Library Uses LPD Violence to Stop Free Speech." He attended without incident. (AA Vol. 1-166; AA Vol. 1-203). After the event ended, he asked Jon Ratzlaff if he would be placed in PITS again; Ratzlaff falsely claimed he had not displayed his sign inside. (AA Vol. 1-167; AA Vol. 1-203). Dr. Spiehs then stood silently inside again with the same sign, after which Ratzlaff called police and claimed his access was suspended. Police did not respond. (AA Vol. 1-166; AA Vol. 1-203).

On March 31 2025, Dr. Spiehs entered the Library with a sign stating "Trump is right: if you are born with a dick then you are not a chick." (AA Vol. 1-167; AA Vol. 1-203). Darin McQueen told Dr. Spiehs he was banned for a week and threatened a 90-day ban if he did not leave; police were called. (AA Vol. 1-167; AA Vol. 1-203). Brad Allen arrived and personally declared that

Dr. Spiehs was banned for 90 days. He was entered into the PITS database again. (AA Vol. 1-166; AA Vol. 1-203).

## V. Library Policies and Authority

The Library's Behavior Policy deems unacceptable behavior as "Using obscene, threatening, harassing, or abusive language or gestures – including abusive language and gestures directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics." (AA Vol. 1-157; AA Vol. 1-198). That Policy also deems unacceptable behavior as "Soliciting, panhandling, or canvassing in the Library (except as expressly approved by the Library)." (AA Vol. 1-157; AA Vol. 1-198).

The Free Speech Activities Policy of the Library states that free-speech activities include, but are not limited to, holding or carrying signs, protesting, using expressive conduct or speech, distributing literature, acting as a public speaker, panhandling, and requesting signatures or donations. (AA Vol. 1-161; AA Vol. 1-200). Persons engaging in any free-speech activities are referred to in this policy as "speakers." (AA Vol. 1-161; AA Vol. 1-200). "Sponsors" are groups or individuals that reserve space in the Library under the Reservable Room Policy or Public Event Policy. (AA Vol. 1-161; AA Vol. 1-200). A "designated partner" is an individual or organization who co-sponsors or is affiliated with a sponsor that reserves space in the Library. (AA Vol. 1-162; AA Vol. 1-200).

The Free Speech Activities Policy states that the Library is dedicated to the peaceful study and enjoyment of visitors free from disturbance and unauthorized free-speech activities. (AA Vol. 1-162; AA Vol. 1-200). Accordingly, the Library will not permit free-speech activities inside the Library that would interfere with the study and enjoyment of visitors. (AA Vol. 1-162; AA Vol. 1-200). This policy does not apply to sponsors and their designated partners who reserve space in the Library for programming under the Reservable Room Policy or Public Event Policy. (AA Vol. 1-162; AA Vol. 1-200). For information on free-speech activities at Library-sponsored events, the policy directs readers to the Public Event Policy. (AA Vol. 1-162; AA Vol. 1-200). For information on free-speech activities at non-Library-sponsored events, the policy directs readers to the Reservable Room Policy. (AA Vol. 1-162; AA Vol. 1-200).

For the safety and protection of speakers, Library staff, and patrons, speakers are permitted to engage in free-speech activities only outside of the Library in the public right-of-way. At no time is a speaker permitted to block or otherwise prevent ingress and egress from the Library. (AA Vol. 1-162; AA Vol. 1-200). Posters, pamphlets, or other printed information may not be placed on or attached to the buildings, walls, columns, lights, or other structural or ornamental features of the Library. (AA Vol. 1-162; AA Vol. 1-200). Aggressive or harassing behavior in violation of the law is strictly prohibited. The policy

requires staff to warn a speaker, ask the speaker to leave if non-compliant, and notify police if the speaker refuses. Violations must be documented in the Library's incident-tracking database. (AA Vol. 1-162; AA Vol. 1-200).

## VI. PITS / Incident Tracking System

The "incident tracking database" referenced in the policy uses a software program called "PITS." Dr. Spiehs did not know of it until his later open-records requests revealed that the Library secretly places individuals in this database and metes out bans without their knowledge. (AA Vol. 1-162; AA Vol. 1-201). The Library claims the PITS database is not subject to Kansas Open Records Act disclosure and that the records are secret. (AA Vol. 1-163; AA Vol. 1-201).

The PITS database lists Dr. Spiehs each time as a "Perpetrator" and shows where he was "suspended," meaning the Library no-trespassed him, even though he was never given notice or an opportunity to appeal. (AA Vol. 1-163; AA Vol. 1-201). The PITS database includes a "Behavior Matrix" that escalates adverse consequences for conduct the Library deems unacceptable. Dr. Spiehs was repeatedly entered for "disregarding direction of staff" and suspended without notice or process. (AA Vol. 1-163; AA Vol. 1-201).

Brad Allen stated under oath that video recordings are not retained unless they involve a "security risk or criminal investigation." The Library's

failure to retain any recordings of Dr. Spiehs confirms it viewed none of his conduct as criminal or threatening. (AA Vol. 1-163; AA Vol. 1-201).

The PITS Training Matrix escalates punishment by offense level, labeling patrons "perpetrators" and applying increasingly severe suspensions. (AA Vol. 1-146-47; Vol. 1-201). The Training Matrix provides that if a patron refuses to comply after a first warning and repeats the same behavior, staff may "skip straight to the third-offense level" or impose a longer suspension. (AA Vol. 1-146-47). The Matrix contains no provision for giving the accused notice or an opportunity to be heard either before or after a penalty. (AA Vol. 1-146-48).

Offenses in the Matrix include "behavior that is disruptive to others' use of the Library" and "being unreasonably loud," but Dr. Spiehs was never recorded under those categories. (AA Vol. 1-201). Every PITS report concerning Dr. Spiehs used only the category "disregarding the reasonable direction of staff." (AA Vol. 1-149-151). No report labeled any of his actions as "protesting." (AA Vol. 1-149-151).

The Training Matrix and recorded suspensions demonstrate that the Library escalated punishment without any established notice, hearing, or review process. (AA Vol. 1-149-151). The Library's internal records show that decisions to suspend patrons were made unilaterally by staff without supervisory oversight. (AA Vol. 1-149-151). Dr. Spiehs's repeated classification

as a "perpetrator" under PITS was based solely on the content of his silent expressive conduct. (AA Vol. 1-149-151).

The PITS documentation confirms that he was repeatedly banned for "disregarding direction of staff," even though he had not been disruptive or unlawful. (AA Vol. 1-149-151; AA Vol. 1-201-203). The Library's administration did not provide any public notice, appeal rights, or published criteria for inclusion in the PITS database. (AA Vol. 1-149-151; AA Vol. 1-201-203). The PITS system operated as a secret, escalating punishment regime, applied without due process or transparency. (AA Vol. 1-163; AA Vol. 1-201).

## VII. Video Evidence (2023–2025 Recordings, Ex. 4 et seq).

Dr. Spiehs was present at the Library of the City of Lawrence on May 17 2023 and June 11 2023, during which he took videos stipulated as admissible in the Pretrial Order. (AA Vol. 1-59; AA Vol. 1-198). Defendants filed a Statement of Uncontroverted Material Facts in support of their motion for summary judgment. (AA Vol. 1-78–86). The Statement of Facts includes multiple citations to video exhibits containing timestamped segments. (AA Vol. 1-78–86). Defendants cited Exhibit 2 (May 17 2023 Video, 0:00–4:56). to describe Plaintiff entering the library while holding a protest sign. (AA Vol. 1-78).

Defendants cited Exhibit 2 (4:45–4:55) to describe a library employee informing Plaintiff he could not attend the event if he caused a disruption. (AA

Vol. 1-79). Defendants cited Exhibit 2 (5:04–6:02) to describe a conversation between Plaintiff and an event organizer. (AA Vol. 1-78–79). Defendants cited Exhibit 2 (7:55–8:20; 9:30–9:40) to describe staff explaining that Plaintiff could attend without his signs. (AA Vol. 1-79). Defendants cited Exhibit 2 (10:00–10:20) to describe statements made by Kathleen Morgan regarding outdoor protest. (AA Vol. 1-79). Defendants cited Exhibit 2 (11:15–11:40; 12:15–13:00; 15:00–16:25) to describe discussions about renting the auditorium. (AA Vol. 1-79–80). Defendants cited Exhibit 2 (19:00–20:00) to describe police interaction during the May 17 event. (AA Vol. 1-80).

Defendants cited Exhibit 2 (21:06–23:13) to describe Plaintiff leaving the library. (AA Vol. 1-80). Defendants cited Exhibit 2 (22:50–23:13) to describe police officers leaving without issuing a citation. (AA Vol. 1-80). Defendants cited Exhibit 5 (June 11 2023 Video 3:10:59 PM, 1:20–2:10) to describe security instructions before the June 11 event. (AA Vol. 1-80). Defendants cited Exhibit 6 (June 11 2023 Video 3:15:46 PM, 0:17–0:28) to describe the wording of Plaintiff's signs. (AA Vol. 1-80). Defendants cited Exhibit 7 (June 11 2023 Video 3:20:52 PM, 1:30–2:00) to describe Plaintiff placing signs in a purse. (AA Vol. 1-80–81). Defendants cited Exhibit 8 (June 11 2023 Video 3:27:42 PM) to describe Plaintiff entering the event without a sign. (AA Vol. 1-81).

The Library had security-video footage of all incidents but failed to retain those records even after this lawsuit was filed. (AA Vol. 1-201; AA Vol. 1-163).

Brad Allen, the Library Director, stated under oath that video recordings are not retained unless they involve a "security risk or criminal investigation." The Library's failure to retain any videos of Dr. Spiehs means it did not consider his actions to present a security risk or to be criminal. (AA Vol. 1-201; AA Vol. 1-163).

The videos of the May 17 and June 11 2023 events were included in the parties' summary judgment memoranda as Exhibit 4, which was stipulated in the Pretrial Order. (AA Vol. 1-165; AA Vol. 1-213). Exhibit 4 lists the conventionally filed video recordings corresponding to the events of May 17 2023 and June 11 2023. (AA Vol. 1-217). Each video listed in Exhibit 4 was admitted by stipulation as accurately depicting the events shown and constitutes admissible evidence of the Library's conduct. (AA Vol. 1-59; 1-157, 1-165; AA Vol. 1-213; Vol. 1-197).

The videos collectively show that Dr. Spiehs and others stood or sat silently and made no disruptive statements or gestures during any of the recorded incidents. (AA Vol. 1-199; AA Vol. 1-80). The Library staff nonetheless directed police involvement on multiple occasions based solely on the content of the messages displayed on the signs. (AA Vol. 1-165-166). These videos were maintained by Plaintiff and filed conventionally pursuant to local rule, as the Library failed to retain its own surveillance copies. (AA Vol. 2-4; AA Vol. 2-55).

When the Library was asked in Interrogatory 7 to identify the specific language in the Speech Activities Policy that Dr. Spiehs violated in Incident 217 on November 25 2024, it did not provide any specific language but merely referred to the "Free Speech Activities Policy previously produced." (AA Vol. 1-168; AA Vol. 1-214).

The videos of the June and May events described in the summary judgment record are included as Exhibit 4 and, as stipulated in the Pretrial Order, accurately reflect the events shown. (AA Vol. 1-168).

The district court stated in its memorandum that "the plaintiff does not cite with particularity to any of the several videos in the record to support that assertion, let alone a specific timestamp citation to the several hours of video footage in the record. The Court will not dig through the record to find such a reference." (AA Vol. 2-91).

## VIII. Intended Future Conduct

Dr. Spiehs intends to return to the Library communicating in the same manner described in these events. (AA Vol. 1-168; AA Vol. 1-203).

ARGUMENT

## I. THE DISTRICT COURT'S REFUSAL TO VIEW PLAINTIFF'S TIMESTAMPED VIDEO EVIDENCE WAS FACTUALLY FALSE AND LEGALLY ERRONEOUS
### A. The Court's Rationale Was Factually False

The district court refused to review Plaintiff's video evidence, stating:

*"The Court will not dig through the record to find such a reference. Plaintiff does not cite with particularity to any of the several videos in the record to support that assertion, let alone a specific timestamp citation."* (Order at 7 n.26, emphasis added).

That statement was incorrect. Plaintiff's response to Defendants' Statement of Facts contained more than thirty specific timestamp citations, across five pages of controverting facts, all using the same format Defendants had used and the court had already accepted:

| Appendix | Facts | Timestamps |
|---|---:|:---:|
| AA Vol. 2-9 | ¶ 34 | 4 |
| AA Vol. 2-10 | ¶¶ 35, 37 | 9 |
| AA Vol. 2-11 | ¶¶ 40–41, 45 | 5 |
| AA Vol. 2-12 | ¶¶ 46, 49–50 | 4 |
| AA Vol. 2-13 | ¶¶ 52, 54 | 5 |

## B. The Video Record the Court Refused to View

1.     **POLICE REPEATEDLY DECLINED TO ENFORCE THE "NO-SIGN" RULE** — four separate occasions where law enforcement determined Dr. Spiehs's silent sign-holding was lawful and non-disruptive. (AA Vol. 2-9 ¶ 34; 2-10 ¶ 35; 2-11 ¶ 41; 2-12 ¶ 49).

*Implication:* trained officers charged with maintaining order saw no disturbance, directly contradicting the Library's disruption narrative.

2. **THE SECRET BAN AND NOTICE FAILURE** — videos on March 27 and 31 (AA Vol. 2-12 ¶ 50; 2-13 ¶¶ 52–54) show Dr. Spiehs was never informed of his "suspension" until confronted by police days later, after which Director Allen ordered officers to remove him.

*Implication:* a textbook procedural-due-process violation under *Goss v. Lopez*, 419 U.S. 565, 579 (1975).

## C. The Court Applied a One-Sided Evidentiary Standard

Defendants' summary-judgment statement (AA Vol. 1-78 *et seq*). cited timestamps in this form: "Exh. 2 at 0:00–4:56," "Exh. 2 at 7:55–8:20," etc., explaining that citations were by minutes and seconds. (*Id.* n.4). The court accepted those citations and recited them as "uncontroverted facts." (Order at 6-8). Plaintiff's citations—identical in format—were rejected. (AA Vol. 2-9 through 2-13). The court thus accepted the movant's timestamps but declared the non-movant's nonexistent. Such differential treatment is indefensible under Rule 56.

## D. Legal Error Under *Scott*, *Tolan*, and *Anderson*

Rule 56 requires courts to view the record in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 380 (2007). When objective video evidence exists, the court must view it directly; it cannot disregard it because of labeling or convenience. *Id.* By crediting Defendants' version of events while ignoring the contradictory videos, the district court "improperly weighed the

evidence and resolved disputed issues." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Under *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986), the evidence of the nonmovant "is to be believed." Here, the district court did the opposite—accepting only Defendants' timestamps and declaring Plaintiff's nonexistent. This was not a factual mistake but a **pure legal error** in applying Rule 56.

## E. The Error Was Repeated Across Multiple Filings

By the time of the ruling, the court had before it three briefs containing timestamped citations: (a) Defendants' Opening Brief (Dkt. 109) — 13 timestamps accepted; (b) Plaintiff's Response (Dkt. 114) — 30+ timestamps in identical format; and (c) Defendants' Reply (Dkt. 123) — added further timestamps. The court's statement that Plaintiff provided none required ignoring the entire record. Such selective review contravenes the "full-record" review standard of *Scott* and *Tolan*.

## F. Conclusion

By refusing to view Plaintiff's timestamped videos—while relying on Defendants'—the district court violated Rule 56 and committed reversible legal error. *Tolan*, 572 U.S. at 659. The judgment must therefore be reversed and the case remanded for trial.

## 3. THE DISTRICT COURT'S FORUM MISCLASSIFICATION INFECTED ITS ENTIRE ANALYSIS

## A. The Lawrence Public Library Is a Designated Public Forum

The district court's classification of the Lawrence Public Library as a nonpublic forum was outcome-determinative—and wrong. Order at 10–11. This foundational error infected every subsequent ruling and must be reversed. Few spaces embody the First Amendment's marketplace of ideas more directly than a public library. *Brown v. Louisiana*, 383 U.S. 131, 142 (1966). Public libraries are not nonpublic enclaves—they are designated public fora. The Tenth Circuit settled this question in *Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012), holding that "[t]he Albuquerque Public Library is a designated public forum for the receipt and communication of information." The reason is straightforward: libraries exist to facilitate the free exchange of ideas. They invite "all members of the public" to enter, read, study, meet, and communicate without advance approval or viewpoint screening. *Id.*; *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975) (when government opens property to expressive activity, it creates a public forum). Lawrence's library operates identically. Its policies permit displays, literature distribution, public programming, author talks, and community meetings—all without prior viewpoint review. (AA Vol. 1-198 to 201). By opening its space to indiscriminate public expression, the Library became a designated public forum subject to strict scrutiny. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S.

384, 391 (1993). The Library has "failed to exercise the clear and consistent control required to maintain a limited public forum." *Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir. 2001).

## B. The District Court Failed to Conduct the Required Factual Inquiry

"Forum status is an inherently factual inquiry about the government's intent and the surrounding circumstances that requires the district court to make detailed factual findings." *Verlo v. Martinez*, 820 F.3d 1113, 1144 (10th Cir. 2016). The district court made no such findings. Instead, it accepted a conclusory staff declaration that the interior was "not a public forum" reserved for "quiet use." Order at 10.

This approach violates *Verlo* and *Cornelius v. NAACP Legal Defense Fund*, 473 U.S. 788, 802 (1985), which require courts to examine actual practice, not bureaucratic labels. Under *Cornelius*, forum classification turns on practice, not proclamation. The Library's practice was expressive, open, and unregulated—precisely what transforms government property into a designated forum. The undisputed record shows the Library routinely hosted drag readings, author panels, and community programs—events that by definition are expressive. This reflects precisely the "laissez-faire, standardless practice" that creates a designated forum. *Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.*, 767 F.2d 1225, 1232 (7th Cir. 1985); *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990); *Hopper*, 241 F.3d at

1080; *United Food & Commercial Workers v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998).

## C. Designated Forum Status Demands Strict Scrutiny

Once a space is designated for public expression, content-based restrictions must satisfy strict scrutiny: they must be narrowly tailored to serve a compelling interest and leave open ample alternative channels. *Doe*, 667 F.3d at 1129; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983). A restriction that applies based on the expressive medium or topic is content-based and presumptively invalid. *Reed* at 163 (applies even to facially neutral restrictions where enforcement turns on expressive content).

The Library's "Free Speech Activities Policy" fails this test immediately. It categorically bans "holding or carrying signs, protesting, using expressive conduct or speech, distributing literature" by ordinary citizens—while exempting "designated partners" and internal groups who may engage in identical conduct. (AA Vol. 1-200 to 201). This is textbook viewpoint discrimination: the same expressive activity is forbidden or permitted based solely on the speaker's identity and relationship with the government. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107–08 (2001).

Even under the more forgiving "reasonableness" standard for limited fora, this policy fails. Restrictions must be "reasonable in light of the forum's

purpose." *Perry* at 49. Banning silent symbolic expression—including blank paper—bears no reasonable relationship to a library's educational mission. *Brown* at 142 (peaceful expression in library protected by First Amendment).

## D. The District Court Applied the Wrong Scrutiny and Wrong Burden

The district court's use of mere reasonableness review gutted the First Amendment's protections. In a designated public forum, the government bears the burden of proving narrow tailoring and actual disruption. *Doe*, 667 F.3d at 1129–30. On summary judgment, the nonmovant's evidence must be viewed in their favor, and all reasonable inferences drawn accordingly. *Anderson* at 255).

Defendants produced no evidence of disruption. Every police encounter ended with officers declining enforcement because no disruption occurred. (AA Vol. 2-9 to 13). Because the district court misclassified the forum, it applied the wrong standard, placed the burden on the wrong party, and reached the wrong result. This foundational error infected every downstream ruling—including the "blank paper" incident and sign prohibitions discussed below.

## E. Correct Classification Compels Reversal

This fundamental misclassification permeates every subsequent ruling. Once corrected, the Library's categorical ban on visual expression—including even blank cardboard—cannot survive constitutional scrutiny. Recognizing the Library as a designated public forum—which *Doe* requires—dooms Defendants' restrictions. A blanket ban on signs and "protest" cannot survive

strict scrutiny. It is neither narrowly tailored nor supported by any evidence of actual interference with library operations. It forbids even silent, inoffensive expression. The First Amendment does not permit such sweeping suppression. *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994).

**4. THE "BLANK PAPER" INCIDENT EXPOSES FATAL CONSTITUTIONAL DEFECTS**

**A. Blank Cardboard Triggered Enforcement; Actual Protest Did Not**

The constitutional infirmities of the Library's policy crystallized on December 1, 2024, when Dr. Spiehs silently stood inside the Library holding a blank piece of cardboard—no words, no images, no message. Library staff summoned police and demanded he be charged with harassment. The officers declined, finding no disturbance and no violation of law. (AA Vol. 2-18; Vol. 1-202 ¶ 47). The Library nonetheless entered Dr. Spiehs into its secret PITS database as a "perpetrator" for "disregarding staff direction." (AA Vol. 2-18 ¶ 30).

At that same moment, another patron, David Basten, stood nearby holding a large sign stating "This public library should be defunded for constitutional violations!" He was permitted to remain. (AA Vol. 2-18 ¶ 29). The contrast is stark: blank cardboard warranted police intervention and database entry; explicit textual protest of the Library itself did not. This enforcement pattern—punishing potential expression while tolerating actual criticism—reveals that the policy does not regulate disruption. It regulates

thought. That the district court overlooked this episode underscores its failure to scrutinize the policy's actual operation.

## B. No Reasonable Person Could Predict That Blank Paper Violates Library Policy

A regulation is void for vagueness when it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Library's Free Speech Activities Policy prohibits "holding or carrying signs" and engaging in "expressive conduct or speech," but provides no definitions, no examples, and no limiting principles. (AA Vol. 1-200–201).

The record demonstrates that even Library staff could not consistently apply their own rule. A printed flyer was tolerated. A shirt bearing words was permitted. But blank cardboard triggered immediate police removal. When enforcement turns on staff intuition about what *might* become expressive, the policy fails the most basic requirement of fair notice. *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971) (ordinance void where "men of common intelligence must necessarily guess at its meaning").

If blank paper is a sign, then so is a book cover, a folder, or any surface capable of later bearing a message—criminalizing potential expression on the mere possibility that a medium might someday carry content. Nothing in the policy—or in common understanding—warns citizens that colorless, wordless

cardboard constitutes prohibited "expressive conduct." When enforcement depends on subjective intuition rather than objective standards, it is not law— it is discretion. "No man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Grayned*, at 108. This is standardless enforcement masquerading as policy—the paradigm of unconstitutional vagueness.

## C. The Policy Suppresses Substantial Protected Expression

The policy's overbreadth is equally fatal. It categorically prohibits "holding or carrying signs, protesting, using expressive conduct or speech, [and] distributing literature"—a sweeping ban covering core First Amendment activity. (AA Vol. 1-200–201). A regulation is facially invalid when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

The Library's rule fails this test decisively. Its "plainly legitimate sweep"—if any—would cover only conduct that actually disrupts library operations: loud protests, physical obstruction, or harassment of patrons. But the policy reaches far beyond: it forbids *all* expressive display within the Library's walls, regardless of size, volume, location, or disruption. Silent sign-holding. Leaflet distribution. Visual symbols on clothing or bags. Even blank paper.

As in *Brown v. Louisiana*, silent symbolic presence lies at the core of First Amendment protection. This blanket suppression cannot be justified as a permissible time, place, and manner restriction. *Doe v. City of Albuquerque* at 1129 (library restrictions must be "narrowly tailored to serve the government's significant interest in maintaining library facilities"). The Library chose not the narrowest but the broadest possible means—total prohibition—thereby suppressing vast quantities of constitutionally protected expression to reach a hypothetical handful of disruptive cases.

## D. Enforcement Reveals Content and Viewpoint Discrimination

The Library's enforcement pattern exposes the policy's true nature: it regulates not conduct but content. This is not hypothetical; it is documented in the Library's own PITS records and video evidence.

- A shirt reading "Free Speech Died Here" was allowed; the same words on paper were banned. (AA Vol. 2-17 ¶ 25).
- An LGBTQ-themed flag was permitted; a "Don't Tread on Me" flag was prohibited as "protesting." (AA Vol. 2-19 ¶ 31).
- David Basten's sign criticizing the Library was tolerated; Dr. Spiehs's blank cardboard was not. (AA Vol. 2-18 ¶¶ 29–30).

These distinctions rest not on noise, obstruction, or disruption—the traditional bases for regulating expressive conduct—but on the perceived message, medium, and viewpoint. That is content-based discrimination. "Government regulation of speech is content-based if a law applies to

particular speech because of the topic discussed or the idea expressed." *Reed* at 163.

Even worse, the pattern suggests viewpoint discrimination. Expression aligned with the Library's institutional preferences (LGBTQ pride, criticism of opponents) proceeds unimpeded. Expression disfavored by staff (conservative symbols, blank media with uncertain messages) triggers immediate intervention. Such favoritism is "the most egregious form of content discrimination." *Rosenberger* at 829.

Viewpoint discrimination is unconstitutional in *any* forum—even nonpublic ones. *Cornelius* at 806 (1985). In a designated public forum like this Library, it is per se invalid.

## E. Blank Paper Is the *Reductio ad Absurdum*

The blank-paper incident is not an outlier—it is the inevitable culmination of the policy's logic:

- It criminalizes expression by *appearance* alone, without regard to actual content.
- It vests unbounded discretion in staff to predict what might become expressive.
- It punishes expressive *potential*, not actual disturbance.

When a library expels a citizen for holding blank cardboard, it is no longer protecting order or tranquility. It is policing imagination. It is punishing the capacity for future speech—the very antithesis of the First Amendment.

This Court need not speculate about chilling effects. The Library's enforcement already achieved total suppression: Dr. Spiehs was removed for carrying *nothing*—the purest form of silent expression.

If blank paper can be banned, then so can closed books (they might be opened), folded newspapers (they might be displayed), or hands (they might gesture). The policy collapses into absurdity because it has no limiting principle. It grants officials absolute authority to silence citizens based on hunches about what they *might* say.

## F. The Policy Cannot Survive Any Level of Scrutiny

Whether analyzed under strict or limited-forum standards, the result is the same: the policy fails. Because the Library is a designated public forum (see Section 3, *supra*), its policy must survive strict scrutiny. It does not. There is no compelling interest in banning all visual expression, and even if preventing disruption were compelling, a total prohibition is not narrowly tailored. *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (striking citywide sign ban as "foreclosing too much speech").

Here, the Library has foreclosed *all* visual expression in the one place the First Amendment most protects the exchange of ideas. The policy is underinclusive (it exempts favored speakers), overinclusive (it bans silent, non-disruptive expression), and administered arbitrarily (blank paper violates

it; actual protest does not). That combination is fatal under strict scrutiny. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011).

Even under the lesser reasonableness standard for limited fora, the policy fails. Ejecting a silent citizen for blank cardboard is not "reasonable in light of the forum's purpose." *Perry* at 49. It is authoritarian caprice. This Court should hold the Free Speech Activities Policy facially unconstitutional. At minimum, the policy is unconstitutional as applied to Dr. Spiehs's blank-paper incident—an application so detached from any legitimate government interest that it shocks the conscience of the First Amendment.

## Section IV. The District Court's Omission of the Procedural-Due-Process Claim Requires Reversal

### A. The Library Secretly Banned Plaintiff Without Any Process

The record is undisputed. Through its PITS, the Library repeatedly suspended Dr. Spiehs without notice or opportunity to contest the action. The PITS log itself concedes: "Suspension – Justin Spiehs (not informed)." (AA Vol. 2-17). Director Brad Allen testified that only staff impose PITS suspensions and that the Library has no procedure for notice, hearing, or appeal (AA Vol. 1-200). The internal Training Matrix confirms that the system contains no step for notifying patrons or providing review (AA Vol. 2-9). Dr. Spiehs first learned of his suspensions only when staff enforced them (AA Vol. 1-203 ¶ 50). These admissions establish deprivations of both notice and a meaningful opportunity

to be heard—the core guarantees of procedural due process. *Goss* at 579; *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

## B. The District Court Never Addressed the Claim

The court's memorandum analyzed only forum status and sign restrictions; it never mentioned notice, hearing, or the PITS suspensions. Such total silence on a pleaded constitutional theory is reversible error. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1208 (10th Cir. 2007) (reversal required where independent constitutional claim ignored). Rule 56 obligated the court to resolve each asserted claim; by granting summary judgment while omitting Count IV, it entered judgment on a theory it never analyzed—contrary to Rule 56 and to fundamental adjudicatory fairness.

## C. The Secret-Ban Regime Violated Clearly Established Law

It has long been clearly established that exclusion from public property requires notice and opportunity to respond. *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266-67 (11th Cir. 2011) (park and library bans without hearing violate due process); *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998) ("Secret or arbitrary deprivations are the antithesis of due process."). The Library's PITS system—an internal registry labeling patrons "perpetrators," escalating penalties, and authorizing police removal—fits that description precisely. Such hidden punishment is incompatible with due process. *Goss*, at 579; *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1259 (3d Cir. 1992).

## D. Remedy: Reversal or, At Minimum, Remand for Adjudication

Because the record is complete and the constitutional violation appears on its face—the Library concedes Plaintiff "was not informed" and that no hearing process exists—no factual remand is required. The proper disposition is reversal with instructions to enter judgment for Plaintiff on Count IV or, at minimum, remand with directions to adjudicate the claim under *Goss* and *Loudermill*.

## E. Qualified Immunity Cannot Shield Secret Bans

Even had the district court reached Count IV, qualified immunity would not apply. By 1975, *Goss* required notice and an opportunity to respond before exclusion from a public institution. *Loudermill* reaffirmed that "the root requirement of the Due Process Clause" is a hearing before deprivation (470 U.S. at 542). Later appellate decisions applied these principles to library and public-space bans—*Catron*, *Kreimer*, and *Vollmecke v. Independence Sch. Dist.*, 2024 WL 1363456 (W.D. Mo. 2024)—making the rule unmistakable by 2023. The Tenth Circuit has likewise held that intentional, unreviewable deprivations violate clearly established law. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004); *Van Deelen v. Johnson*, 497 F.3d 1151, 1158 (10th Cir. 2007). This is an "obvious case" under *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). No reasonable official could think it lawful to place a citizen on a secret exclusion list with no notice, no reasons, and no recourse.

**Conclusion.** The Library's undisputed admissions establish a textbook violation of procedural due process, and the district court's total omission of Count IV requires reversal and entry of judgment for Plaintiff or, alternatively, remand with instructions to decide the claim under *Goss* and *Loudermill*.

## V. The Library Retaliated Against Dr. Spiehs for His Protected Speech

### A. Governing Standard

A First Amendment retaliation claim requires proof that (1) the plaintiff engaged in protected activity, (2) the defendant's conduct would deter a person of ordinary firmness from continuing that activity, and (3) the conduct was substantially motivated by the protected expression. *Van Deelen* at 1158; *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000); *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The inquiry is objective: whether the government's conduct "would chill a person of ordinary firmness from continuing to engage in protected activity." *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001).

Dr. Spiehs's conduct—displaying signs, recording events, and criticizing public officials—was core political speech. *City of Houston v. Hill*, 482 U.S. 451, 461 (1987); *Texas v. Johnson*, 491 U.S. 397, 406 (1989). The Library publicly invited citizens to attend the May 17 and June 11 2023 programs (AA Vol. 1 at 157–159). Dr. Spiehs and companions entered silently with signs expressing disagreement with the Library's gender-identity programming (AA Vol. 1 at

158–161). He neither spoke nor disrupted, yet staff ordered him removed solely because of the signs' content (AA Vol. 1 at 159–161). Such viewpoint-based exclusion from a public forum is protected activity. *Kreimer* at 1259.

The district court appeared to adopt a pejorative framing of Dr. Spiehs as a so-called "First Amendment auditor" by repeating the irrelevant description that he wanted to be "internet famous." Such rhetoric suggests bias rather than analysis. *See David R. Dewberry, First Amendment Audits: Comparing the Arguments for the Right to Record on the Street to Arguments in Case Law,* 57 Argumentation & Advocacy 85, 86 (2021) (noting that critics deride such individuals as "frauditors," implying they seek online notoriety rather than vindication of constitutional rights). That label is constitutionally meaningless. The Supreme Court has repeatedly held that the speaker's motive—whether to express an opinion, expose inconsistency, or test compliance—does not diminish protection. *Texas* at 404–06; *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 54–56 (1988); *Snyder v. Phelps*, 562 U.S. 443, 451–58 (2011). Silent, non-disruptive protest in a public facility remains fully protected regardless of motive. *Brown* at 141–42; *Tinker v. Des Moines,* 393 U.S. 503, 508–09 (1969). Dr. Spiehs's decision to document and test the Library's restrictions strengthens, not weakens, his First Amendment claim.

**C. Adverse Action**

The Library repeatedly banned Dr. Spiehs through its PITS after each incident. Each record listed "Suspension – Justin Spiehs (not informed)" (AA Vol. 1 at 165). Director Brad Allen confirmed that these suspensions barred access and could trigger police enforcement (AA Vol. 1 at 200). Exclusion from a public facility is an adverse action that would deter ordinary citizens from further speech. Van Deelen, 497 F.3d at 1158; Guffey v. Wyatt, 18 F.3d 869, 873 (10th Cir. 1994). By its own admissions, the Library escalated bans from one week to ninety days (AA Vol. 1 at 167), confirming a retaliatory pattern rather than neutral enforcement.

## D. Causal Connection

TEMPORAL AND DOCUMENTARY LINKAGE SHOW RETALIATION. Each PITS entry followed immediately after Dr. Spiehs's expressive acts:

• May 17 2023: Removed after silent sign display; police summoned at Kathleen Morgan's direction (AA Vol. 1 at 159).
• June 11 2023: Removed after holding signs; told "we've been over this before with the signs" (AA Vol. 1 at 160).
• Nov. 25 – Dec. 9 2024: Silently displayed signs or flags; each time classified as "perpetrator" and suspended (AA Vol. 1 at 165–166).
• Mar. 31 2025: Held sign referencing gender; immediate 90-day ban imposed by Director Allen (AA Vol. 1 at 167).

No record identifies any disruption or safety risk apart from the speech's content. Every PITS report lists only "disregarding reasonable direction of

staff" (AA Vol. 1 at 149–151). Under *Mount Healthy,* the absence of a legitimate, non-speech basis proves retaliatory motive. 429 U.S. at 287.

## E. Clearly Established Law

By the time of these events, it was clearly established that officials may not retaliate against citizens for criticizing public institutions or for expressive activity in a public forum. *Van Deelen* at 1158; *Worrell* at 1212.

By 2024–2025, courts within this Circuit had already applied those same principles to nearly identical fact patterns. In *Schmidt v. Huff,* No. 24-2422-JAR, 2025 WL 3221052 (D. Kan. Aug. 14, 2025), the court denied qualified immunity to school-district officials who banned a silent speaker from public comment, holding that viewpoint-based exclusion and post-meeting trespass orders violated clearly established First Amendment law. Likewise, in *Czaplinski v. Ballard,* 2025 WL 2986832 (D. Kan. Oct. 23, 2025)*: Chief Judge* Broomes denied qualified immunity to a superintendent who banned a parent for making eleven phone calls complaining about bullying.

These decisions confirm that by the time of Dr. Spiehs's removals, any reasonable official in Kansas or Missouri would have known that excluding or banning a non-disruptive speaker for viewpoint is unconstitutional. No reasonable official could believe that maintaining a secret registry of "perpetrators," imposing escalating bans, and summoning police for peaceful

sign-holding was lawful. Such conduct falls within the "obvious case" rule of *Hope v. Pelzer.*

## F. Conclusion

The Library's own records confirm that Dr. Spiehs was punished not for disruption but for viewpoint. He engaged in protected speech; the Library imposed adverse bans capable of chilling any ordinary citizen; and those bans were motivated by his expression. This case mirrors *Van Deelen*, where hostility toward a vocal critic supported reversal of summary judgment. 497 F.3d at 1158. The judgment on Count V should therefore be reversed and the case remanded for entry of judgment on liability or, at minimum, trial on the retaliation claim.

## VI. Equal Protection and Comparator Analysis

Whether the district court erred in dismissing Dr. Spiehs's class-of-one Equal Protection claim by demanding nearly identical comparators and crediting defendants' factual assertions, contrary to *Village of Willowbrook v. Olech,* 528 U.S. 562 (2000), and Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210 (10th Cir. 2011).

The Equal Protection Clause prohibits arbitrary government discrimination against an individual "without a rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. A class-of-one plaintiff need only show that (1) he was intentionally treated differently from others

similarly situated, and (2) no rational basis existed for the differential treatment. *Kansas Penn Gaming*, 656 F.3d at 1216. "Similarly situated" means similar in the respects material to the government's asserted justification, not identical in every detail. *A.M. v. Holmes*, 830 F.3d 1123, 1167 (10th Cir. 2016).

The Library's sole asserted justification was preventing "disruption." (Order at 20; AA Vol. 1 at 149–151 [PITS entries citing "disregarding reasonable direction of staff"]). Differences relevant to that interest—volume, movement, interference—could be material; differences in paper size or holding style are not.

## 1. November 25 2024 – Paper Signs

Both Dr. Spiehs and patron Michael Eravi silently displayed paper signs in the main reading area. (AA Vol. 1 at 165; AA Vol. 1 at 171–172). Eravi's message praised the Library's inclusivity; Dr. Spiehs's criticized its gender programming. Neither obstructed patrons nor caused complaint. Staff expelled only Dr. Spiehs. (AA Vol. 1 at 165). The differential treatment was based solely on viewpoint, not conduct, violating *Mosley*, 408 U.S. at 96.

## 2. December 9 2024 – Flags

Both individuals displayed flags. Eravi draped a Pride flag as a cape, consistent with the Library's own Pride displays; Dr. Spiehs held a small Gadsden flag silently. (AA Vol. 1 at 166–167; AA Vol. 1 at 173–174). Neither blocked aisles or spoke. Yet staff again removed and later suspended Dr.

Spiehs in PITS ("Suspension – Justin Spiehs [not informed]") while leaving Eravi undisturbed. (AA Vol. 1 at 165; AA Vol. 1 at 200 [Allen Decl. confirming no notice procedure]). This is a textbook *Olech* violation—identical conduct punished only when expressing disfavored views.

### 3. Court's Erroneous Comparator Standard

The district court required Dr. Spiehs to be "similarly situated in every material respect," citing minor differences—11 × 16 paper versus 8.5 × 11 and holding a flag versus wearing one (Order at 24–25). That standard contradicts *Kansas Penn Gaming* and *A.M. v. Holmes*. Only differences related to disruption are material. Paper size and manner of display are constitutionally irrelevant where both speakers were silent and non-disruptive. (AA Vol. 1 at 158–161 [videos showing quiet sign holding]; AA Vol. 1 at 165–167 [PITS entries without any alleged disturbance]).

Treating a 3½-inch size difference as dispositive would yield absurd results: 8.5 × 11 paper protected, 8.5 × 14 legal paper not, 11 × 17 tabloid forbidden. The Equal Protection Clause does not calibrate rights by page size.

### D. Conclusion

Because Dr. Spiehs and his comparators were alike in all respects material to the Library's stated interest in avoiding disruption, yet were treated differently based on viewpoint, Count V was wrongly dismissed. The judgment

should be reversed and the claim remanded for trial or entry of judgment in Dr. Spiehs's favor under *Olech* and *Kansas Penn Gaming*.

## VII. The Library's Behavior and Free-Speech Policies Broadly Prohibit Expressive Activity

The Lawrence Public Library enforces two overlapping policies regulating patron conduct: the Behavior Policy and the Free-Speech Activities **Policy** (AA Vol. 1 at 142–147).

### 1. Behavior Policy (AA Vol. 1 at 142–145)

- Prohibits "behavior that disturbs others' use and enjoyment of the Library, or interferes with Library operations."

- Requires that "patrons must follow the reasonable direction of staff at all times."

- States that "failure to comply with staff direction may result in removal or suspension of Library privileges."

- Lists examples such as "loud, harassing, or offensive conduct, or any other activity that impedes others' use of the facility."

### 2. Free-Speech Activities Policy (AA Vol. 1 at 146–147)

- Prohibits "protesting, sign-holding, or expressive conduct inside the Library where it may interfere with the study or enjoyment of visitors."

- Declares that patrons "may not act as public speakers or engage in expressive activity inside Library buildings."

- Restricts "free-speech activities" to outdoor sidewalks or plazas and requires prior coordination if such activities "might attract crowds or impede entry."

- Authorizes Library staff to decide when conduct "becomes disruptive" and to remove or suspend patrons accordingly.

## 3. Administrative interpretation

Library Director Allen confirmed the policy's sweeping reach in his

sworn declaration:

The Library did not allow protesting inside the Library under the Behavior Policy because protesting is disturbing and disruptive to others' use of the Library. Protesting was only allowed outside the Library. Since I have been employed at the Library, the Library has never allowed protesting with signs inside the Library.
Dkt. 109-2; at 2; AA Vol. 1 at 200).

## VII-B. The Policies Enshrine a Heckler's-Veto Standard and Ban Speech to the Sidewalk

The Library's rules make the exercise of First Amendment rights depend

entirely on the subjective comfort of others. The Behavior Policy forbids

"behavior that disturbs others' use and enjoyment of the Library" (AA Vol. 1 at

142). That standard is the essence of a *heckler's veto*: expression becomes

punishable whenever an observer feels "disturbed." The Supreme Court has

long rejected that principle. *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) (speech

may not be punished because it "stirs people to anger"); *Brown* at 142 (silent

library sit-in protected). Nothing in the policy tells a librarian how to decide

when another patron's "use and enjoyment" is "disturbed." The trigger could be words, attire, or mere presence. "Offensive conduct," another undefined term (AA Vol. 1 at 144-145), was applied to Dr. Spiehs's silent display of a blank sheet of paper—conduct lying at the core of symbolic speech protected by *Spence v. Washington*, 418 U.S. 405 (1974). Such amorphous prohibitions are void for vagueness and enable viewpoint-based enforcement.

The Free-Speech Activities Policy extends the same defect by banning "protesting, sign-holding, or expressive conduct inside the Library where it may interfere with the study or enjoyment of visitors," and by declaring that patrons "may not act as public speakers or engage in expressive activity inside Library buildings" (AA Vol. 1 at 146-147). These clauses replicate the *heckler's veto* in bureaucratic form: any expression that attracts attention "interferes" with others' enjoyment. The policy further restricts all "free-speech activities" to outdoor sidewalks or plazas and requires "coordination with Library administration if such activities might attract crowds or impede entry." But the First Amendment is not confined to the curb. *United States v. Grace*, 461 U.S. 171, 180 (1983). Government may impose reasonable time-, place-, and manner limits, but it cannot banish speech from the forum itself and declare that expression belongs only on the sidewalk. To forbid speech because it might "attract crowds" is to outlaw the very purpose of speech—to persuade and

engage an audience. Under this regime, unpersuasive speech is allowed, persuasive speech is forbidden.

Finally, the phrase "act as a public speaker" is unintelligible. Perhaps Dr. Spiehs did this. Does it mean speaking to what number of other patrons simultaneously? The blanket prohibition on "expressive activity" mirrors the rule struck down in *Board of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987), which created a "First-Amendment-free zone." Quoting from a book? Carrying a book whose title conveys a message? The Library's interior has become exactly that.

Because these policies hinge on audience reaction, banish speech from the very forum where information is exchanged, and lack any objective standards, they are facially vague, overbroad, and constitutionally untenable.

## VII-C. The Policies Are Unconstitutional Both Facially and As Applied; the PITS Records Confirm Pretext

Even if a library may adopt reasonable rules to preserve order, these particular policies are unconstitutional both **on their face** and **as applied** to Dr. Spiehs. *Grayned* at 108; *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1888 (2018).

## 1. Facial invalidity

The Behavior and Free-Speech Activities policies prohibit undefined categories of expression—"behavior that disturbs others' use and enjoyment," "offensive

conduct," "protesting," "acting as a public speaker," and "expressive activity" (AA Vol. 1 at 142–147). None of these terms provides fair notice or limits discretion. They empower staff to silence any expression another patron finds "disturbing," creating a *heckler's-veto* regime indistinguishable from the one condemned in *Coates v. Cincinnati* and *Brown v. Louisiana*. By banning all "expressive activity" inside the Library and confining "free-speech activities" to outdoor sidewalks, the policies transform the Library into a First-Amendment-free zone—the same defect struck down in *Board of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987). The First Amendment does not end at the Library's doors. *Grace*, at 180.

## 2. As-applied invalidity and pretext

The policies' vagueness enabled pretextual enforcement through PITS. Each entry labeled Dr. Spiehs a "perpetrator" and cited only **"**disregarding reasonable direction of staff" as the violation (AA Vol. 1 at 165–167). None alleged loudness, threats, or obstruction. Each imposed suspension without notice—"Suspension – Justin Spiehs (not informed)"—and escalated the punishment from one week to ninety days. Director Brad Allen confirmed that staff entered these suspensions and that police could enforce them (AA Vol. 1 at 200). The Training Matrix contains no definitions, notice provisions, or appeal rights (AA Vol. 2 at 9).

Such enforcement shows how amorphous terms like "reasonable direction" and "disturbs others' enjoyment" become pretextual tools for viewpoint suppression. Dr. Spiehs's supposed "disobedience" consisted of silently holding signs; staff converted his persistence in protected expression into "failure to follow directions." That use of undefined authority is exactly the unconstitutional application condemned in *Van Deelen* at 1158 (retaliation cloaked as neutral enforcement).

### 3. Result

Because the Library's policies lack objective standards and were applied to punish protected speech under color of "behavior control," they fail both the facial and as-applied vagueness tests and cannot sustain summary judgment. The PITS records confirm that what was labeled "disruption" was in fact dissent.

### VII-D. Even if Treated as Content-Neutral, the Library's Blanket Ban Fails Narrow Tailoring; if Content-Based, It Fails Strict Scrutiny

The Library's defense reduces to a formula: *"We have rules — you broke them — therefore we prevail."* That syllogism assumes both that the Library stands outside the First Amendment's reach and that its policies are constitutionally sound. But the premise fails. When the underlying rules are themselves vague, overbroad, and content- or viewpoint-based, the enforcement rationale collapses.

Nor may the Library escape scrutiny by redefining its own status. Public libraries are not administrative offices or private enclaves; they are "dedicated to the communication of ideas through quiet, contemplative activity," and thus operate as at least designated or limited public fora for expression consistent with that mission. *Doe* at 1128; *Kreimer* at 1259. Government may not downgrade a public forum through administrative fiat or selective enforcement. *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1123 (10th Cir. 2002); *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1256 (10th Cir. 2005). A library's open invitation to the public, civic purpose, and expressive character make it a paradigmatic First Amendment space. It cannot be transformed into a speech-free zone merely by declaring, "we have rules."

## 1. The Library's Ban on Signs and Expressive Conduct Is Content-Based and Cannot Survive Strict Scrutiny

The Free-Speech Activities Policy prohibits "protesting, sign-holding, or expressive conduct inside the Library" (AA Vol. 1 at 146–147). Enforcement depends entirely on the *content and purpose* of expression: a silent patron holding a book is welcome; the same patron holding a sign criticizing the Library is expelled. That is textbook content discrimination. *Reed* at 163). By labeling an entire medium of expression—signs—as "protest," the Library commits the error condemned in *City of Ladue v. Gilleo*, 512 U.S. 43 (1994):

banning an entire medium eliminates "a venerable means of communication." Because the Library offers no compelling interest—only generalized "disturbance" fears unsupported by evidence—the restriction cannot survive strict scrutiny.

## 2. Even under intermediate scrutiny, the rules are not narrowly tailored

Assuming arguendo the Library's interest is preserving order, the policies still fail *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), and *McCullen v. Coakley*, 573 U.S. 464 (2014). The record shows **no actual disruption**—no noise, obstruction, or complaint—resulting from Dr. Spiehs's silent signs (AA Vol. 1 at 159–161, 165–167). The Library thus imposed the **most restrictive means**—a total ban and suspension—without evidence that lesser, objective measures (decibel limits, location guidance, warning) would not suffice. *McCullen* at 494 (government must demonstrate it "seriously undertook to address the problem with less intrusive tools").

## 3. Forum classification cannot save the rule

Even in a limited or nonpublic forum, restrictions must be reasonable and viewpoint-neutral. *Perry Educ. Ass'n*. Labeling peaceful dissent "disturbing" or "protesting" is not viewpoint-neutral. The Library's internal statement—"We aren't a public library technically" (AA Vol. 1 at 160)—reveals deliberate forum evasion inconsistent with *Doe v. City of Albuquerque* and

*Kreimer v. Bureau of Police*, both recognizing libraries as expressive venues dedicated to "quiet, contemplative communication."

## 4. Conclusion

Whether viewed under strict or intermediate scrutiny, the Library's categorical prohibition and secret PITS enforcement are not narrowly tailored to any legitimate interest. The policies are **overinclusive** (barring silent, non-disruptive expression) and **underinclusive** (tolerating favored messages). Under *Reed*, *Ladue*, and *McCullen*, the rules cannot stand.

## VII-E. Conclusion on Forum and Policy Invalidity

Each provision of the Library's Behavior and Free-Speech Activities Policies independently sweeps far beyond unprotected conduct and criminalizes ordinary, peaceful expression. Together, they convert a forum "dedicated to the communication of ideas through quiet, contemplative activity" into a censorship regime governed by audience discomfort and staff discretion. *Doe* at 1128; *Kreimer* at 1259.

1. **"BEHAVIOR THAT DISTURBS OTHERS' USE AND ENJOYMENT" / "OFFENSIVE CONDUCT"**

   This clause makes expression unlawful whenever another patron feels "disturbed" or "offended," a textbook heckler's veto. It captures silent, symbolic, and political displays—a Bible verse, a pride symbol, or, as here, a blank sheet of paper (¶¶ 70–74, 91; AA Vol. 1 at 158–161). The

First Amendment forbids punishment based on listener reaction. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Terminiello* at 1.

2. **"PATRONS MUST FOLLOW THE REASONABLE DIRECTION OF STAFF"**

"Reasonable" is undefined, giving employees unbridled discretion to order silence whenever speech causes discomfort. Such open-ended authority is indistinguishable from the prior-restraint system struck down in *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969). PITS entries confirm the danger: every suspension cited only "disregarding direction of staff" (¶¶ 75–81).

3. **"FAILURE TO COMPLY … MAY RESULT IN REMOVAL OR SUSPENSION"**

This provision punishes refusal to obey unconstitutional orders, effectively criminalizing persistence in protected expression. *Papachristou v. Jacksonville*, 405 U.S. 156 (1972) condemns such amorphous authority as an invitation to arbitrary enforcement.

4. **"PROTESTING, SIGN-HOLDING, OR EXPRESSIVE CONDUCT … WHERE IT MAY INTERFERE WITH STUDY OR ENJOYMENT"**

"May interfere" prohibits even hypothetical disturbance and thus codifies a preemptive heckler's veto. *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 252 (6th Cir. 2015); *Ison v. Madison Loc. Sch. Dist.*, 3 F.4th 887 (6th Cir. 2021). Director Allen confirmed that the Library has *never*

allowed sign-based protest inside because it is "disturbing and disruptive" (Dkt. 109-2 at 2–4; AA Vol. 1 at 200).

5. **"PATRONS MAY NOT ACT AS PUBLIC SPEAKERS OR ENGAGE IN EXPRESSIVE ACTIVITY INSIDE LIBRARY BUILDINGS"**

"Expressive activity" encompasses nearly everything from reading aloud to carrying a book as protest—each protected under *Tinker*. The Supreme Court invalidated an identical blanket ban in *Board of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987), which condemned creation of a "First-Amendment-free zone." The Library's policy does precisely that (¶¶ 70, 91).

6. **OUTDOOR-ONLY RULE ("FREE-SPEECH ACTIVITIES" CONFINED TO SIDEWALKS OR PLAZAS)**

Banishes all expression from the forum itself and punishes speech that "might attract crowds or impede entry." That language penalizes persuasive speech—the very objective of the First Amendment. *Grace*, 461 U.S. 171; *First Unitarian Church* at 1123.

These clauses, singly and together, lack objective standards, hinge on audience reaction, and reach protected expression at the heart of the First Amendment. The policies are therefore **facially overbroad and void for vagueness** under *Grayned* and *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Their application through the PITS system confirms viewpoint-based enforcement and renders them unconstitutional **as applied**. Because these

policies regulate speech through discretion, not disruption, they cannot survive any level of First Amendment scrutiny. The district court's contrary ruling should be reversed.

## VII-F. The Policies Are Underinclusive and Confirm Viewpoint Discrimination

Even if the Library's stated interests—preserving quiet, preventing disturbance, and ensuring access—were legitimate, its policies are fatally **underinclusive**, targeting disfavored messages while tolerating comparable or greater disruption from favored or neutral activities. Such selective regulation exposes that the Library's real motive was to suppress dissent, not preserve order. *Reed* at 171; *McCullen* at 486–87.

1. **Sign-holding vs. other visible expression.** The Library prohibited Dr. Spiehs from silently holding signs or blank paper critical of its gender-identity programming (¶¶ 70–74, 91; AA Vol. 1 at 158–161), yet allowed patrons and staff to display or wear expressive messages—such as Pride flags, Library slogans, or promotional materials—inside the same space. If distraction were the true concern, all signs would be treated equally—but selective enforcement shows viewpoint discrimination. *City of Ladue v. Gilleo,* 512 U.S. 43, 52–53 (1994). **"Disturbs others' enjoyment."** "Disturbs others' enjoyment" was enforced only against dissent, not equally disruptive conversation—

revealing that "disturbance" meant disagreement, not noise. The selective enforcement shows the order rationale was a pretext. *Forsyth*, at 134.

2. **"Act as public speakers or engage in expressive activity."** The Library regularly sponsors lectures, readings, and musical performances—each a form of "public speaking." By permitting institutionally approved speech while banning spontaneous expression by patrons, the policy discriminates based on sponsorship and viewpoint. *Rosenberger* at 829.

3. **Outdoor-only rule.** Outdoor-only speech rules exclude dissent but allow similar indoor events—showing the aim wasn't crowd control but suppressing persuasive expression. That underinclusive policy reflects viewpoint discrimination. *McCullen*, at 486–87; *First Unitarian Church*, at 1123.

Because the Library's rules permit favored expression while suppressing disfavored viewpoints, they are not narrowly tailored to any legitimate interest and fail even intermediate scrutiny. This under inclusiveness, combined with vagueness and overbreadth, confirms that the Library's enforcement was viewpoint discrimination masquerading as neutrality. The judgment upholding these policies should therefore be reversed.

## VIII. Past Injury, Ongoing Injury, and Redressability

### A. Injury

An injury exists when the government restricts expressive activity or imposes penalties for constitutionally protected conduct. *Susan B. Anthony List* at 158–61; *Worrell* at 1212. The Tenth Circuit recently reaffirmed that when a government rule "requires or forbids some action by the plaintiff," the plaintiff "almost invariably states an injury in fact." *Smith v. Albany County Sch. Dist. No. 1*, 121 F.4th 1374, 1378 (10th Cir. 2024) (quoting *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024)).

Dr. Spiehs was repeatedly punished—expelled, suspended, and secretly flagged—for peaceful dissent, mirroring the injuries the Tenth Circuit deemed sufficient in Smith, 1378. Like there, penalties for asserting constitutional rights are not self-inflicted. (AA Vol. 1 at 158–67).

### B. Ongoing and Predictive Harm

The existence of the PITS entry and continuing enforcement authority renders the harm ongoing. The Supreme Court holds that an injury continues when a plaintiff remains "under a credible threat of enforcement." *Driehaus*, at 159. Dr. Spiehs's prior suspensions demonstrate a pattern of escalating punishment—identical speech repeatedly triggering harsher sanctions—providing the predictive value demanded by *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009). Unlike speculative plaintiffs in *Lujan* or

*Springer*, Spiehs's intention to return is proven by past returns and continuing designation in the Library's registry.

## C. Traceability and Non-Self-Inflicted Harm

The Library's claim that Spiehs "chose" his injuries fails under *Smith* and *FEC v. Cruz*, 596 U.S. 289, 297 (2022). The Tenth Circuit held in Smith that even voluntary exposure to a mandate doesn't make enforcement injuries self-inflicted, 121 F.4th at 1378–79. Here too, bans and database entries were direct retaliation. Exercising constitutional rights doesn't invite punishment— *Fish v. Kobach*, 840 F.3d 710, 754, called that argument "border[ing] on the absurd."

## D. Redressability and Nominal Damages

Relief would fully redress Spiehs's injuries by expunging his PITS record, restoring access, and preventing further bans. Where a completed constitutional violation has occurred, nominal damages alone satisfy redressability. *Uzuegbunam v. Preczewski*, 592 U.S. 111, 120–25 (2021); *Carey v. Piphus*, 435 U.S. 247, 266 (1978). Spiehs's past suspensions and ongoing stigma make this a live controversy regardless of future enforcement risk.

## IX. QUALIFIED IMMUNITY AND POLICY RESPONSIBILITY

### A. THE VIOLATIONS WERE "OBVIOUS CASES" UNDER CLEARLY ESTABLISHED LAW

Qualified immunity does not protect officials who violate rights that any reasonable officer would recognize as unlawful. *Hope* at 739:

1. **Blanket speech ban** – *Board of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987), invalidated language prohibiting "First Amendment activities."

2. **Silent expressive conduct** – *Tinker* established that peaceful symbolic expression may not be suppressed absent material disruption.

3. **Secret suspension without notice** – *Goss* at 579 requires notice and opportunity to respond before exclusion.

4. **Viewpoint-based removal** – *Acosta v. City of Costa Mesa*, 718 F.3d 800 (9th Cir. 2013), held that ejecting a speaker for critical expression in a public meeting is plainly unconstitutional.

No reasonable library official could believe it lawful to forbid silent sign-holding, impose an undisclosed ban, or command compliance with unconstitutional directives: obvious violations under *Hope* and *Tolan*.

## B. DEFENDANTS ACTED ULTRA VIRES—QUALIFIED IMMUNITY DOES NOT APPLY

Qualified immunity attaches only to discretionary acts within delegated authority. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The record (AA Vol. 1 ¶ 62) shows the Library Board never delegated power to staff to create or enforce bans. The PITS registry and verbal "directions" were unauthorized and *ad-hoc*. These actions are ultra vires and unprotected. *See Schmidt v. Huff*

(denying immunity where officials imposed speech bans without board approval).

## C. INCONSISTENCY BETWEEN QUALIFIED-IMMUNITY AND *MONELL* RULINGS

If the Behavior Policy and PITS system were official Board policies, municipal liability attaches under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), and *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). If, instead, staff acted without authorization, then no *Monell v. Department of Social Services*, 436 U.S. 658 (1978) immunity exists: the individuals bear personal liability. Yet the lower court granted both qualified immunity with no *Monell* liability without deciding which premise applied.

## D. CONCLUSION

Because the Library's actions violated clearly established law and, alternatively, were taken outside any lawful authority, neither qualified immunity nor the absence of *Monell* liability can stand.

# CONCLUSION

Competing motions must be evaluated independently, resolving all factual inferences against the movant. *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979); *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). That standard was violated by crediting Defendants' version of events, disregarding Plaintiff's timestamped

evidence, and granting judgment to the appellees without ever considering whether Appellant's evidence independently entitled him to judgment.

Because all facts material to liability are undisputed and the issues are purely legal, this Court stands in as good a position as the district court to resolve them. *Kerr v. Polis*, 930 F.3d 1190, 1195 (10th Cir. 2019). The record is complete, and Defendants never controverted the PITS entries, video timestamps, or the text of the challenged Library policies. Each controlling issue turns solely on questions of law, which this Court may and should decide outright.

The undisputed evidence shows that:

1.     The Library's two policies categorically prohibit "protesting, sign-holding, or expressive conduct" inside the building and punish "behavior that disturbs others' use and enjoyment." Their text is fixed and undisputed. Whether those prohibitions are facially overbroad, vague, and content-based is a legal question.

2.     The PITS enforcement records—all written by Library staff—confirm escalating suspensions imposed without notice or hearing. Defendants did not dispute any PITS entry or offer contrary evidence. On these facts, the due-process violation is established as a matter of law. *Goss v. Lopez*.

3.     Forum status of this public library is legal under *Doe v. City of Albuquerque* and *Kreimer v. Bureau of Police:* the Library constitutes a designated public forum.

4.     Because these violations were clearly established, the individual defendants are liable for enforcing unconstitutional restrictions and retaliatory bans, and are not entitled to qualified immunity. *Hope v. Pelzer*; *Van Deelen* at 1151.

5.     The PITS records identify the staff member responsible for each suspension and the supervisors who approved or ratified it. Under *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997), that direct participation satisfies § 1983's causation requirement. No remand is needed.

6.     No remand is required for *Monell* liability. The policies are written, adopted, and enforced by the Library Board—the governing body of the City of Lawrence. The policies being unconstitutional, municipal liability attaches under *Monell v. Department of Social Services*, 436 U.S. 658 (1978): the policies themselves were the moving force behind the violations.  Defendants offered no evidence of disruption, no notice procedure, and no factual dispute material to liability. Refusal to view Plaintiff's timestamped video evidence is an error that alone warrants reversal.

Accordingly, Plaintiff respectfully requests that this Court:

1.  Reverse the district court's judgment;

2. Declare that the Library's Behavior Policy, Free-Speech Activities Policy, and PITS enforcement scheme are unconstitutional on their face and as applied;

3. Hold that Defendants Morgan, Allen, and other involved staff are individually liable for enforcing unconstitutional policies and retaliating against protected expression;

4. Hold that the City of Lawrence, through its Library Board, is liable under Monell for maintaining and enforcing those unconstitutional policies;

5. Remand solely for entry of judgment, determination of nominal or compensatory damages, and expungement of all PITS entries and suspensions; and

6. Grant such further relief as justice requires.

ORAL ARGUMENT STATEMENT

Dr. Spiehs requests oral argument.


Dated: November 10, 2025

Respectfully submitted,

s/ Linus L. Baker

Linus L. Baker
6732 West 185th Terrace
Stilwell, Kansas 66085
913.486.3913
linusbaker@prodigy.net
*Attorney for Dr. Justin Spiehs*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 13-point proportionally spaced Century School Book typeface using Microsoft Word 2019.

Date: November 10, 2025          s/ Linus L. Baker
                                 Linus L. Baker

**CERTIFICATE OF DIGITAL SUBMISSION**

1.      I hereby certify that all required privacy redactions have been made; that a hard copy of the Appellants' Opening Brief will be submitted to the Court pursuant to 10th Cir. R. 31.5 and will be an exact copy of the version submitted electronically via the Court's ECF system; and that this document has been scanned for viruses with the most recent version of a commercial virus scanning program, Norton 360, and is free of viruses according to that program.

Date: November 10, 2025                s/ Linus L. Baker
                                       Linus L. Baker

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2025, a true and accurate copy of this brief and addenda was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

SAMUEL ROBERTS

3550 S.W. 5TH STREET

TOPEKA, KANSAS 66606

TEL: (785) 232-7761 | FAX: (785) 232-6604
SGREEN@FPSSLAW.COM
*Attorney for Defendants-Appellees*


Date: November 10, 2025          s/ Linus L. Baker
                                 Linus L. Baker

**ADDENDUM**

1)     District Court's Memorandum Ruling (9/3/2025) ...............................1

2)     Final Judgment (9/3/2025) ................................................................. 28

Addendum 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JUSTIN SPIEHS,**

       **Plaintiff,**

       **v.**                                    **Case No. 24-4016-JAR**

**KATHLEEN MORGAN, et al.,**

       **Defendants.**

### MEMORANDUM AND ORDER

Plaintiff Justin Spiehs brings this 42 U.S.C. § 1983 action alleging constitutional violations by Defendants the Board of Directors of the Free Public Library of the City of Lawrence, Kansas, Kathleen Morgan, Marc Veloz, Sara Mathews, Heather Kearns, Karen Allen, Lauren Taylor, Tristan Star, and Polli Kenn.  Before the Court are Defendants' Motion for Summary Judgment (Doc. 108) and Plaintiff's Motion for Partial Summary Judgment (Doc. 111).  The motions are fully briefed, and the Court is prepared to rule.  For the reasons explained below, the Court grants summary judgment in favor of Defendants and denies Plaintiff's motion for partial summary judgment.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  In applying this standard, a court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[1]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a

---

[1] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

Addendum 1

reasonable jury could return a verdict for the non-moving party."[2]  A fact is "material" if, under

the applicable substantive law, it is "essential to the proper disposition of the claim."[3]  An issue

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

non-moving party."[4]

The moving party must initially show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that

does not bear the ultimate burden of persuasion at trial need not negate the other party's claim;

rather, the movant need simply point out to the court a lack of evidence for the other party on an

essential element of that party's claim.[6]  To prevail on a motion for summary judgment on a claim

upon which the moving party also bears the burden of proof at trial, the moving party must

demonstrate "no reasonable trier of fact could find other than for the moving party."[7]

Once the movant has met its initial burden, the burden shifts to the nonmoving party to

"set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party

may not simply rest upon its pleadings to satisfy this burden.[9]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be

---

[2] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[3] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).

[4] *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[5] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[6] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[7] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

[8] *Anderson*, 477 U.S. at 256.

[9] *Id.*

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (2000)).

identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[11]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[13]

## II.    Uncontroverted Facts

The following material facts are either uncontroverted or stipulated to in the Pretrial Order.[14]

On several different occasions, Plaintiff Justin Spiehs entered the Lawrence Public Library ("Library") displaying signs.  On each occasion he attempted to enter events held at the Library or proceeded to the Library's main reading area.  Library staff, contending that Plaintiff's display of those signs violated its policies, instructed him either to remove his signs or to leave.  Declining both options, Plaintiff continued to display those signs.  Each time, Plaintiff either left voluntarily or was instructed to leave by police.  The Court first explains the Library's policies and then details each of Plaintiff's encounters below.

### *The Library's Policies*

The Library has several policies that help structure its operations and ensure that patrons enjoy access to the Library's various resources.  In May and June 2023, the Library's Behavior

---

[11] *Adams*, 233 F.3d at 1246 (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.3d 1022, 1024 (10th Cir. 1992)).

[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[13] *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[14] Doc. 107.

Policy was in place, which stated: "The Library is committed to providing a safe and respectful environment for all its users.  Behavior that disturbs others' use of the library, creates an unsafe environment, impedes the work of library staff, or creates a risk of damage to library property is not permitted."[15]

On November 25, 2024, the Library promulgated a new policy—the "Free Speech Activities Policy."  The Free Speech Activities Policy stated: (1) "[t]he Library is a limited public forum dedicated to the peaceful study and enjoyment of visitors free from disturbance and unauthorized free speech activities by others,"[16] and (2) "the Library will not permit free speech activities inside the Library that would interfere with study and enjoyment of visitors of the Library."[17]  The Library channeled any free speech activities outside: "speakers are permitted to engage in free speech activities outside of the Library in the public right-of-way."[18]  The Free Speech Activities Policy defines a "free speech activity" as including "holding or carrying signs, protesting, [or] using expressive conduct or speech."[19]  That policy also sets out enforcement procedures.  Patrons violating this policy receive an oral warning from Library staff; patrons who, despite the warning, continue violating the policy are asked to leave the Library's premises; and if a patron who has been warned and asked to leave declines to leave, Library staff calls the Lawrence Police Department and reports that the patron was trespassing.[20]

---

[15] Doc. 109-4 at 1.

[16] Doc. 109-12 at 3.

[17] *Id.*

[18] *Id.* at 4.

[19] *Id.* at 3.

[20] *Id.* at 4.

Addendum 5

Also on November 25, 2024, the Library revised its Public Event, Reservable Room, and Community Bulletin Board policies.  The Library revised the Public Event Policy to add language stating:

> A library event is a limited public forum unless otherwise indicated in event promotional materials.  As such, the Library has the authority to regulate speakers on a time, place, and manner basis. The Library designates those producing and speaking at a library event as sponsors and designated partners who are allowed to express themselves during a library event.  Attendees, other than the sponsor(s) and designated partner(s), must abide by the Free Speech Activities Policy.[21]

The Reservable Room Policy addresses private events.  The revised policy states that at those private events, "event attendees must abide by the Free Speech Activities Policy," which prohibits holding or carrying signs, unless the event's sponsors waive that requirement for attendees.[22]  The Reservable Room Policy was revised to add language exempting from the Free Speech Activities Policy sponsors and their partners of events not sponsored by the Library, and allowing those sponsors to waive the policy.

The revised Community Bulletin Board Policy added: "Materials submitted for posting should be no larger than 11x17"; and stated that smaller posters and flyers are accepted and encouraged.  "All submissions must include the name of and contact information for the sponsoring agency and/or its authorized representative" and "Appeal Process Patrons may appeal and challenge the decline or removal of their content by contacting the Library Executive Director and/or Deputy Director."[23]

---

[21] Doc. 107 at 3.

[22] Doc. 109-12 at 7.

[23] *Id.*

Addendum 5

The Library may ban patrons from the Library, depending on the seriousness of the patron's violative conduct. The type of offense and frequency of the offense determines the length of the ban. For example, the first occurrence of verbally threatening another patron with violence results in a one- to three-month ban; the fourth occurrence results in a year-long ban. The first occurrence of "disregarding the reasonable direction of staff" results in a warning or being asked to leave; the third occurrence yields a one-week ban.[24]

### *Application of Library Policies to Plaintiff*

The Library instructed Plaintiff to leave the Library (1) on May 17 and June 11, 2023 for violating the Behavior Policy; (2) on November 25, November 26, December 1, 2024, and March 27, 2025 incident for violating the Free Speech Activities Policy; and (3) on March 31, 2025 incident for violating an active ban the Library had imposed on him on March 27.

### *1.    Behavior Policy Violations*

Plaintiff attended two events at the Library on May 17 and June 11, 2023. At each, he displayed signs, and individual Defendants instructed him to remove the signs or to leave the Library. He did neither. Officers from the Lawrence Police Department eventually arrived, and Plaintiff left on both occasions.

On May 17, 2023, Kansas Legal Services held an information session open to the public in the Library's auditorium "about current pathways to making gender marker changes" on state-issued documents.[25] Plaintiff entered the Library with a sign that read "if you have a dick, you're not a chick," and he attempted to enter the auditorium with the sign. An individual associated with Kansas Legal Services blocked Plaintiff's entrance to the event by standing in

---

[24] Doc. 109-16 at 1.

[25] Doc. 107 at 2.

front of the auditorium's doors, explaining that Plaintiff could not enter with the sign.  In

addition, Defendants Kearns, Star, Veloz, Morgan, Taylor, Mathews, and Allen gathered around

Plaintiff and informed him that he could not attend the event if he caused a disruption and that if

he intended to display the signs he would have to do so outside.  Defendants understood

displaying the sign to be a form of protest that was disruptive and thus a violation of the

Library's Behavior Policy.[26]

Following this dispute, the host of the Kansas Legal Services' event, asked Morgan

whether she could make the event private, so that the organization could exclude the general

public from attending the event.  Morgan confirmed this option, and the Kansas Legal Services

representative rented the auditorium for the event, making the event private.  Even so, Plaintiff

remained with his sign in the Library, but outside the auditorium where the event was being held.

Police eventually arrived and explained to Plaintiff that he could not enter the event and should

---

[26] Defendants' understanding of the Behavior Policy is supported by Allen's and Morgan's declarations. *See* Docs. 109-2 ¶ 4; 109-5 ¶ 8.  Plaintiff attempts to controvert this fact by arguing that the declarations are argumentative and "lack. . . . foundation as the Library's Board of Trustees is the entity authorized to create Library Policy."  The Court overrules both objections.  The declarations are not argumentative; to the contrary, they provide relevant information.  *See* Fed. R. Evid. 401.  Additionally, under Fed. R. Evid. 602, the declarants "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  The witness's own testimony can provide evidence of personal knowledge.  Fed. R. Evid. 602.  These declarants clearly have personal knowledge about their own understanding of the Library's policies.

Plaintiff also argues that "the statements . . . [are] not what was stated to Dr. Spiehs at the time of the occurrence."  Doc. 114 at 2.  He does not, however, point to any material in the record showing what statements Library staff stated to him *during the occurrence*.  First, he notes that "the dialogue from the video specifically stated Library staff said it was the words and message on Dr. Spiehs' sign."  Doc. 114 at 2.  But he does not cite with particularity to any of the several videos in the record to support that assertion, let alone a specific timestamp citation to the several hours of video footage in the record.  *See* Fed. R. Civ. P. 56(c)(1)(A).  The Court will not dig through the record to find such a reference.  Second, Plaintiff points to his own affidavit stating that the Library's "Patron Incident Tracking System" ("PITS") included no report characterizing his signs as "disruptive," "interference," or "disturbance."  *See*  Doc. 114-2.  But the undisputed facts show that the first PITS report for Plaintiff was for the November 25, 2024 incident.  *See* Doc. 109-13 at 1; Doc. 109-2 ¶ 9.  The PITS database included no report characterizing his signs as disruptive for the May 17 or June 11 incidents.  Because Plaintiff has failed to cite with particularity to the record and, at best, raises only a "metaphysical doubt" as to Defendants' factual assertion, he has failed to controvert Defendants' evidence about their understanding of the Behavior Policy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

leave to avoid a trespass violation. Plaintiff did so and chose to display his signs outside the Library.

On June 11, 2023, an event titled "Deja's Reading Rainbow" was held in the Library's auditorium. Plaintiff entered the Library with signs reading "Stop Grooming Kids" and "This is Wrong," and he attempted to attend the event. Defendant Star told Plaintiff that he could not be disruptive or display the sign at the event. To comply with that instruction, Plaintiff stowed his signs in his companion's purse and entered the event. But once inside, he removed the signs from the purse and displayed them. This disrupted the event, so Star asked Plaintiff to leave because he violated the Behavior Policy by "disturb[ing] others' use of the library."[27]

### 2.    *Free Speech Activities Policy Violations*

Plaintiff entered the Library four times to display signs in the main reading area of the Library. Each time, library staff asked him to remove the signs because they violated the Library's Free Speech Activities Policy.[28]

On November 25, 2024, the Library held a public meeting during which it promulgated the Free Speech Activities Policy and revised several existing policies and guidelines. Plaintiff attended this meeting, and after it concluded, he stood next to another Lawrence citizen, Michael Eravi, in the Library's primary reading area while holding a sign reading, "Free Speech died here tonight, ask me how." Eravi held a paper with the Library's new Free Speech Activities Policy on it. Library employee John Ratzlaff asked Plaintiff to put away his sign, but did not ask Eravi

---

[27] Plaintiff has attempted but failed to controvert this factual assertion for the same reasons explained in the previous footnote.

[28] Defendants largely rely on the PITS reports to support their assertions regarding Plaintiff's behavior on these several occasions. Plaintiff objects to their reliance on the PITS reports in part because they "contain[] no foundation as to being sworn under oath or true, and how they purport to know." *See, e.g.*, Doc. 114 at 4. But Plaintiff has already stipulated to the reports' admissibility in the Pretrial Order. *See* Doc. 107 at 4. His objection is therefore overruled.

Addendum 9

to do the same.  Plaintiff declined.  Ratzlaff asked again; Plaintiff again declined.  So Ratzlaff asked Plaintiff to leave the building, and because Plaintiff refused to leave, Ratzlaff called the Lawrence Police Department.  Plaintiff eventually left.

On November 26, Plaintiff entered the Library and again stood in the Library's main reading area with the same sign.  Star told Plaintiff that he could not display the sign, and Plaintiff refused to put it away.  Star called the Lawrence Police Department to remove Plaintiff.  He eventually left.

On December 1, Plaintiff again entered the Library and displayed a sign in the Library's primary reading room.  This time he had a different sign: a large blank poster.  Allen called the Lawrence Police Department to ask how the Library should handle protestors in the Library.  Officers arrived and spoke with Plaintiff.  He eventually left.

On March 27, 2025, the Lawrence–Douglas County Public Health Department rented the Library's auditorium to hold a private event.  Plaintiff attended that event, and because it was a private event and the sponsor allowed him to display his sign, he was allowed to display his sign at the event.  After the event concluded, Plaintiff remained in the Library and stood in the Library's entrance holding a sign that read: "This library uses LPD violence to stop free speech."[29]  Ratzlaff asked Plaintiff to remove his sign, and Plaintiff refused.  Ratzlaff then asked Plaintiff to leave, but he refused that direction, too.  So Ratzlaff called the Lawrence Police Department once more to remove Plaintiff.  Plaintiff later left the Library.  This incident resulted in the Library imposing a one-week ban of Plaintiff from the Library.

---

[29] Doc. 112-2 ¶ 49.

Addendum 9

### 3.    *Enforcement of Library Ban*

The Library did not inform Plaintiff of its March 27, 2025 ban before Plaintiff arrived at the Library on March 31 for an event hosted by the American Civil Liberties Union in the Library's auditorium.  Plaintiff again arrived with a sign—this one declaring that "Trump is right: if you are born with a dick then you are not a chick."[30]  But because the ban was still active, Library staff informed Plaintiff that his Library privileges had been suspended and he therefore must leave the Library.  Plaintiff refused.  A member of the Library staff then explained that if he needed to call the Lawrence Police Department to remove Plaintiff, then Plaintiff's suspension would be heftier this time—a three-month suspension.  Plaintiff remained undeterred.  So the Library staff called the police, who arrived and eventually told Plaintiff that he needed to leave or face a potential trespass charge.  He left.

## III.    Discussion

The Pretrial Order was entered in this case on April 25, 2025, less than one month before the summary-judgment deadline.[31]  The Pretrial Order "controls the course of the action unless the court modifies it."[32]  "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived."[33]  It is true that the Pretrial Order should be "'liberally construed to cover any of the legal or factual theories that might be embraced by their language.'  But the

---

[30] *Id.* ¶ 50.

[31] Doc. 107.

[32] Fed. R. Civ. P. 16(d).

[33] *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

primary purpose of pretrial orders is to avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial will be.'"[34]

According to the Pretrial Order, Plaintiff asserts the following counts under 42 U.S.C. § 1983 against Defendants: (1) a First Amendment facial vagueness challenge to the Library's Free Speech Activities Policy, Behavior Policy, Exhibit and Display Policy, Community Bulletin Board, and Reservable Room Guidelines; (2) an as-applied challenge to the same policies identified in Count 1; (3) First Amendment retaliation; (4) First Amendment content- and viewpoint-discrimination as-applied to him; and (5) a facial and as-applied Fourteenth Amendment equal-protection challenge to the Library's policies.  He brings all claims against the Library in its official capacity; he brings Counts 2 through 5 against the individual Defendants in their individual capacities.  Plaintiff is bound by the claims and factual assertions alleged in the Pretrial Order, and the Court declines to entertain his arguments in the summary judgment briefing that expand those assertions.[35]

Defendants move for summary judgment on all claims in this matter.  First, they argue that Plaintiff lacks standing to challenge Library policies that were not applied to him, as alleged in Counts 1 and 2.  The individuals invoke qualified immunity on the individual-capacity claims. The Library moves for summary judgment on the official-capacity claims on the basis that there is no underlying constitutional violation.  Plaintiff moves for partial summary judgment on Defendants' "defenses."  The Court considers the parties' arguments on each claim in turn.

---

[34] *Id.* (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979), and *Cortez*, 460 F.3d at 1276).

[35] *See* Doc. 114, Pl.'s Additional Statement of Facts ¶¶ 28–29 (describing incident with David Baston); *id.* at ¶¶ 31–32 (detailing December 9, 2024 incident); *Leathers v. Leathers*, 856 F.3d 729, 760 (10th Cir. 2017) ("Claims or theories that are not included in the pretrial order usually are waived."); *Washington v. Unified Gov't of Wyandotte Cnty., Kan.*, 847 F.3d 1192, 1202 (10th Cir. 2017) (finding no abuse of discretion when district court "confine[s] the issues to those in the pre-trial order.").

### A.    Standing (Counts 1 and 2)

Defendants first contend that Plaintiff lacks standing to challenge the Library policies identified in Counts 1 and 2 that were never applied to him.  Article III of the Constitution permits federal courts to decide only "Cases" or "Controversies."[36]  Article III standing is jurisdictional; therefore, the party seeking federal jurisdiction bears the burden to establish standing.[37]  To have standing, Plaintiff must show that he (1) has suffered an injury-in-fact, (2) that was "likely caused" by Defendants, and (3) that "would likely be redressed by judicial relief."[38]  Also, he "must demonstrate standing for each form of relief sought."[39]  Plaintiff only seeks declaratory and injunctive relief on Counts 1 and 2,[40] so he must show that he has standing to pursue prospective relief for both claims—that he "suffer[s] a continuing injury or [is] under a real immediate threat of being injured in the future."[41]  Although "past injuries are relevant to showing a risk of future harm," they do not, standing alone, conclusively establish "a present case or controversy" where the plaintiff seeks prospective relief.[42]

In the First Amendment context, a plaintiff may satisfy the standing requirement by showing that a speech restriction "causes a separate injury: the litigant is chilled from engaging in constitutionally protected activity."[43]  And suffering "'chilled speech[]' . . . satisfies the

---

[36] U.S. Const. art. III, § 2; *see Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).

[37] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021).

[38] *Id.* at 423.

[39] *Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (quoting *Lippoldt v. Cole*, 468 F.3d 1204, 1216 (10th Cir. 2006)).

[40] Doc. 107 at 12.

[41] *Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017).

[42] *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

[43] *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1239 (10th Cir. 2023).

'injury-in-fact' prong for Article III standing."[44]   A speech restriction's chilling effect will constitute an injury-in-fact when the "chilling effect 'arise[s] from an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution of other consequences following from the statute's enforcement."[45]   The Tenth Circuit has articulated three factors that determine "whether a plaintiff has sufficiently alleged a chilling effect that amounts to a cognizable injury."[46]   Plaintiffs can show a chilling effect by:

> (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced.[47]

A plaintiff need not, however, "satisfy the *Walker* factors at all to establish standing; they merely help . . . resolve the core question," which remains whether the chilling effect amounts to an injury-in-fact.[48]

Plaintiff lacks standing to bring his claims for prospective relief on Counts 1 and 2.  At the outset, the Court notes that Plaintiff does not respond to Defendants' standing argument, which Plaintiff bears the burden to establish.  His failure to respond alone warrants dismissal of Counts 1 and 2 to the extent they are based on policies that have not been applied to him.[49]

---

[44] *Id.* (quoting *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1160 (10th Cir. 2023)).

[45] *Oliver*, 57 F.4th at 1160 (10th Cir. 2023) (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)).

[46] *Wyo. Gun Owners*, 83 F.4th at 1239.

[47] *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (emphasis in original).

[48] *Wyo. Gun Owners*, 83 F.4th at 1239; *Rio Grande*, 57 F.4th at 1160 ("*Walker* acknowledged circumstances might satisfy the relatively relaxed standard for an injury-in-fact on a chilled speech claim without meeting all the *Walker* factors.")

[49] *See Tyler v. U.S. Dep't of Educ. Rehab. Servs. Admin.*, 904 F.3d 1167, 1175 n.4 (10th Cir. 2018) (finding that plaintiff waived any argument for standing by "fail[ing] to address its standing to bring the . . . claim"); *Cuesta v. SMT Holdings, Inc.*, No. 21-cv-3094, 2022 WL 15516990, at *7 (D. Colo. Oct. 27, 2022) ("Plaintiff's failure to respond to Defendant's standing challenge warrants dismissal of Plaintiff's sole claim against [it].").

Addendum 14

Dismissal is also warranted because the record does not support Plaintiff's standing to obtain the prospective relief he seeks on Counts 1 and 2 as to any of the Library's policies.

First take the policies that *have not* been applied to Plaintiff—the Exhibit and Display Policy, Community Bulletin Board Policy, and Reservable Room Policy.  All of the *Walker* factors weigh against finding a cognizable injury-in-fact.  First, Plaintiff has not engaged in the type of speech that any of those policies cover.  There is no evidence in the record that Plaintiff attempted to use a Library "exhibit space to showcase [his] work,"[50] under the Exhibit and Display Policy; to post information on the "public bulletin board space" or to "passive[ly] distribut[e] materials"[51] at the Library under the Community Bulletin Board Policy; or to reserve the Library's "auditorium, meeting rooms, [or] study rooms."[52]  Second, Plaintiff has offered no affidavit or testimony that he has a desire to engage in speech covered by those policies.  Third, the record reflects no evidence that Plaintiff has refrained from engaging in such speech because of these three policies.  The Court therefore concludes that Plaintiff has not shown an injury-in-fact that would support standing for his prospective claims based on the policies that have not been applied to him.

Now take the policies that *have* been applied to Plaintiff—the Behavior Policy and the Free Speech Activities Policy.  The parties do not address whether Plaintiff has standing to pursue a prospective remedy based on these policies, but the Court has an independent duty to "assure itself that it has subject matter jurisdiction" over all the claims before it.[53]  Although these policies present a closer question of whether they have chilled Plaintiff's speech to confer

---

[50] Doc. 109-11 at 1.

[51] Doc. 109-12 at 1.

[52] *Id.* at 7.

[53] *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1093 (10th Cir. 2004).

Addendum 14

standing for prospective relief, the Court concludes that Plaintiff has not shown a chilled effect

sufficient to confer standing to assert these claims as well.  These two policies have been

enforced against Plaintiff, so the first *Walker* factor weighs in his favor.  As does the second:

Plaintiff submitted an affidavit averring that:

> As I have before, I again intend on returning to the Library
> carrying and displaying the same or different messages on flags,
> paper, and cardboard.  I intend to return to do things that might
> violate all of the prohibitions of panhandling, signs, protest,
> evangelize, demonstrate, things that might give me attention and
> audience in the Library, ask for signatures, donations, and
> contributions, things that might distract or otherwise interfere with
> staff and individuals so-called 'enjoyment' in this public venue, as
> well as distribute literature in that manner.[54]

But Plaintiff's affidavit proves too much: he discounts any subjective deterrence from the

Behavior Policy or Free Speech Activities Policy.  And that is fatal because "standing on a

chilled-speech claim requires both subjective and objective deterrence," and subjective

deterrence requires "that the plaintiff claims to be deterred by the challenged" speech

restriction.[55]  Far from saying that he has "no intention to [speak] *because of* a credible threat" of

enforcement,[56] he says the exact opposite: that he intends to speak despite any threat of

enforcement.  That admission dooms his claim.

In *Rio Grande Foundation v. City of Santa Fe*,[57] the plaintiff sought prospective relief

against Santa Fe's enforcement of campaign-spending disclosure requirements.[58]  The Tenth

Circuit applied the *Walker* factors to ascertain whether the plaintiff had shown an injury-in-fact

---

[54] Doc. 112-2 ¶ 51.

[55] *Rio Grande*, 57 F.4th at 1164.

[56] *Id.* (emphasis in original) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006)).

[57] 7 F.4th 956 (10th Cir. 2021).

[58] *Id.* at 958.

through the statute's chilling effect.[59]  The Circuit concluded that the plaintiff had easily satisfied the first two factors—it had already made expenditures affected by the ordinance and had submitted an affidavit asserting that it desired to continue doing so.[60]  But, the Circuit noted, the plaintiff failed the third factor because its affidavit explained that it "fully intends to continue speaking," despite the ordinance's restriction on that speech.[61]  The plaintiff therefore never "assert[ed] that its future speech will be any more limited than it would be in the absence of [the speech restriction]."[62]  And "[w]ithout such a claim," the Circuit concluded that the plaintiff "fail[ed] to carry its burden of showing an injury-in-fact," even despite having satisfied the first two *Walker* factors.[63]  To be sure, a plaintiff need not satisfy the *Walker* factors to show an injury-in-fact through chilled speech.[64]  But Plaintiff has done more than just fail to satisfy the third factor; he has made representations *incompatible* with the "subjective deterrence" component of chilled speech.[65]  He declares that he "intend[s] on returning to the Library carrying and displaying the same or different messages on flags, paper, and cardboard."[66]  Because the policies have not chilled his speech, Plaintiff fails to show an injury-in-fact through the policies' chilling effect.[67]

---

[59] *Id.* at 959–60.

[60] *Id.* at 960

[61] *Id.* The plaintiff's complaint also averred that it "Intends to Continue Speaking" in a manner restricted by the ordinance. *Id.*

[62] *Id.*

[63] *Id.*

[64] *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1240 (10th Cir. 2023).

[65] *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1160 (10th Cir. 2023).

[66] Doc. 112-2 ¶ 51.

[67] The Court acknowledges that a Plaintiff can show standing for a prospective remedy with either a continuing injury *or* "a real immediate threat of being injured in the future." *Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017).  Plaintiff's clear intention to violate the Library's Policies in the future could arguably show that he faces an immediate future threat of injury.  But that same scenario

Plaintiff therefore lacks standing to pursue his claims for declaratory and injunctive relief as to any of the Library's policies challenged in Counts 1 and 2. Even setting aside his failure to respond to Defendants' standing challenge, the record does not show that the policies have chilled his speech. So he has failed to show "a continuing injury or . . . a real immediate threat of being injured in the future."[68] And without that prospective injury-in-fact, he lacks standing to pursue his claims for prospective relief. The Court therefore dismisses Counts 1 and 2 for lack of standing.

### B.    Individual-Capacity Claims

A defendant sued in his individual capacity may be able to assert personal immunity defenses such as qualified immunity.[69] "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."[70] To this end, qualified immunity shields government officials from liability for money damages unless the plaintiff shows that the official violated a federal statutory or constitutional right, and that the right the official violated was "clearly established" at the time of the challenged conduct.[71]

The individual Defendants move for summary judgment on Plaintiff's individual-capacity claims against them for money damages on the grounds of qualified immunity. Thus, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or

---

arose in *Rio Grande*, and the Court concluded that a clear intention to violate the speech restriction did not confer standing. *Rio Grande Found. v. City of Santa Fe*, 7 F.4th 956, 960–61 (10th Cir. 2021).

[68] *Am. Humanist Ass'n, Inc.*, 859 F.3d at 1250.

[69] *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[70] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

[71] *Id.* at 735 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000) (quoting *Greene v. Barrett*, 174 F.3d 1136, 1142 (10th Cir. 1999)).

constitutional right, *and* (2) that the right was "clearly established" at the time of the challenged conduct.'"[72]  Defendants will prevail on the qualified immunity defense if Plaintiff fails to establish either prong of the this  test.[73]  In making this determination, the Court "ordinarily accept[s] the plaintiff's version of the facts . . . but 'because at summary judgment we are beyond the pleading phase of the litigation, [the] plaintiff's version of the facts must find support in the record.'"[74]

With these standards in mind, the Court first addresses Count 4 alleging content and viewpoint discrimination.  Next, the Court addresses the retaliation claim.  And finally, the Court addresses the equal protection claim.

### 1.    Count 4: Content and Viewpoint Discrimination

The individual Defendants are entitled to qualified immunity on Count 4 because Plaintiff has failed to demonstrate the first step of the qualified immunity analysis: the violation of a federal right.  Count 4 alleges an as-applied challenge to the Library's speech restrictions; the Pretrial Order does not include a facial or overbreadth challenge to the Library's policies.  Therefore, the Court evaluates the restrictions in light of "the factual context in which the [policies] were applied."[75]  Defendants applied the Behavior Policy's prohibition on conduct that "disturbs others' use of the library" during the May 11 and June 17, 2023 events to Plaintiff because he was holding and displaying signs in the Library.  Defendants also applied the Free Speech Activities Policy's prohibition on "holding or carrying signs" during the November 25, November 26, December 1, 2024, and March 27, 2025 incidents against Plaintiff's holding and

---

[72] *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1217 (10th Cir. 2024) (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)).

[73] *Id.* (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

[74] *Id.* (second and third alteration in original) (quoting *A.M.*, 830 F.3d at 1136).

[75] *Galbreath v. City of Oklahoma City*, 568 F. App'x 534, 539 (10th Cir. 2014).

Addendum 19

displaying signs in the Library.  These policies were therefore all applied to Plaintiff's holding and displaying signs in the Library.

 To analyze a First Amendment challenge, courts follow three-steps: (1) determining whether the speech in question is protected; (2) identifying the status of the forum "because that determination dictates the extent to which the government can restrict First Amendment activities"; and (3) determining "whether the proffered justifications for prohibiting speech in the forum satisfy the requisite standard of review."[76]  Here, it is undisputed that Plaintiff's speech was protected under the First Amendment.

 The parties disagree about the status of the forum.  The Supreme Court identified three categories of government property in *Perry*:

> (1) traditional public fora ("streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"); (2) designated public fora ("public property which the State has opened for use by the public as a place for expressive activity"); and (3) nonpublic fora ("[p]ublic property which is not by tradition or designation a forum for public communication").[77]

The Court later identified a "limited public forum" category, but its use of that term "has been inconsistent."[78]

 Defendants contend that the Library is a "designated public forum for a limited purpose,"[79] and Plaintiff contends that it is a designated public forum.[80]  The Tenth Circuit

---

[76] *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

[77] *Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45–46 (1983)).

[78] *Id.*

[79] Doc. 109 at 13–15.

[80] Doc. 112 at 16.

Addendum 19

"recognize[s] that the boundary between a designated public forum for a limited purpose . . . and a limited public forum . . . is far from clear."[81]  Despite the language in the Free Speech Activities Policy, Defendants do not argue in their briefing that the Library is a limited public forum.  In their briefing, Defendants concede that for purposes of determining the appropriate level of scrutiny to apply, the Library should be considered a designated public forum.[82]

In a designated public forum, the level of scrutiny depends on whether the restriction is content neutral or content based.  If the policy is content based, then it must "satisfy strict scrutiny, that is, the restriction must be tailored to serve a compelling government interest."[83]  If the policy is content neutral, then it need only meet intermediate scrutiny[84]—that is, the restriction must (1) "serve a significant government interest," (2) be "narrowly tailored to advance that interest," and (3) "leave open ample alternative channels of communication."[85]  Because neither party disputes that intermediate scrutiny applies to these content-neutral speech restrictions, the Court will evaluate them under intermediate scrutiny.[86]

First, the undisputed facts show that the policies serve a significant government interest—upholding and protecting Library patrons' access to information, study, and quiet contemplation.  In protecting its patrons' activities, the Library ensures that they may enjoy the

---

[81] *Doe*, 667 F.3d at 1129.

[82] *See Summum v. Callaghan*, 130 F.3d 906, 916 n.14 (10th Cir. 1997) ("[A] designated public forum for a limited purpose and a limited public forum are not interchangeable terms.").

[83] *Verlo v. Martinez*, 820 F.3d 1113, 1134 (10th Cir. 2016) (quoting *Pleasant Grove v. Summum*, 555 U.S. 460, 469 (2009)).

[84] *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021).  This level of scrutiny is sometimes referred to as "the *Ward* test."  *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1116 (10th Cir. 2012)).

[85] *Verlo*, 820 F.3d at 1134 (quoting *Doe*, 667 F.3d at 1131).

[86] *See* Doc. 112 at 17 ("The speech rules the Library has enacted and enforced against Dr. Spiehs are therefore subject to a content-neutral time, place, and manner restrictions."); Doc. 109 at 15 ("The Library's policies satisfy each element" of intermediate scrutiny that applies to content-neutral regulations).

Library's very purpose—the First Amendment right to receive information.[87]   Indeed, the Tenth

Circuit has noted that libraries are "opened for particular forms of expressive activity, including

receiving information and 'reading, writing or quiet contemplation,'"[88] but "are not designated

for other First Amendment activities, such as speech or debate."[89]   In addition to the Library's

various offerings of books and media, the Library also holds informational and learning

opportunities that implicate patrons' access to information.   So the rationale still holds even if

Plaintiff's signs disturbed an informational or learning opportunity and not quiet contemplators

actively reading: prohibiting the carrying and displaying of signs avoids disrupting visitors to the

Library who may wish to attend those events.[90]   Facilitating the patrons' enjoyment of those First

Amendment activities is a significant government interest.

      Second, the restrictions are narrowly tailored to advance the Library's interest in

protecting others' access to information, study, and quiet contemplation.   Though narrow

tailoring is redolent of strict scrutiny's precise ends-mean fit, the requirement is softened in the

intermediate-scrutiny context applied to content-neutral restrictions.[91]   "[T]o be narrowly

tailored, [the restriction] must not burden substantially more speech than is necessary to further

the government's legitimate interests."[92]   So "[i]n other words, the government 'may not regulate

---

[87] *Doe v. City of Albuquerque*, 667 F.3d 1111, 1131 (10th Cir. 2012) (recognizing that the First Amendment's right to receive information affords some level of access to the public library); *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 591 (6th Cir. 2003) (same).

[88] *Doe*, 667 F.3d at 1131 (quoting *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1264 (3d Cir. 1992)).

[89] *Id.* at 1129.

[90] *See Kreimer*, 958 F.2d at 1263 ("Prohibiting disruptive behavior is perhaps the clearest and most direct way to achieve maximum Library use.").

[91] *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) ("[A content-neutral] regulation . . . 'need not be the least restrictive or least intrusive means of' serving the government's interests." (quoting *Ward v. Rock Against Racism*, 492 U.S. 781, 799 (1989))).

[92] *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021) (quoting *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071 (10th Cir. 2020)).

Addendum 21

expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'"[93]  The Behavior Policy's prohibition on conduct that disturbs others' access to the Library is precisely tailored to achieve the significant government interest it serves—to avoid disrupting other patrons' access to information at the library.  Here, the means and end have a one-to-one correlation: in order to avoid disruptions, the Behavior Policy prohibits speech that would disrupt others' use of the Library.  The challenged portion of the Free Speech Activities Policy circumscribes its prohibition even more narrowly to "holding or carrying signs," inside the Library[94]

Third, the Library's Behavior and Free Speech Activities policies leave open alternative channels for communication.  Several Defendants informed Plaintiff that though he could not display his signs inside the Library, he could do so in the outdoor right-of-way leading into the Library.  The Library also has a policy that permits patrons to display flyers and other informational displays on the community bulletin board.

The restrictions on displaying signs pass constitutional muster.  The parties agree that the scrutiny appropriate to a designated public forum applies, and the content-neutral restrictions here satisfy that scrutiny because they serve a significant government interest, are narrowly tailored, and leave open ample alternative channels for communication.  Plaintiff has therefore failed to show that the individual Defendants violated a federal right by prohibiting him from displaying and holding signs in the Library, so they are entitled to qualified immunity.  The Court grants summary judgment for the individual Library Defendants on Count 4.

---

[93] *Id.* (quoting *Evans v. Sand City*, 944 F.3d 847, 856 (10th Cir. 2019)).

[94] Doc. 109-12 at 3.

### 2.    Count 3: Retaliation

In Count 3, Plaintiff alleges that he was engaged in constitutionally protected activity in associating, attending, and communicating while at the Library.  He further alleges that Defendants' actions in prohibiting his attendance, stopping his speech, and having him removed from the Library caused him to suffer injuries that would chill a person of ordinary firmness from continuing to engage in that protected activity, and that Defendants were substantially motivated by retaliation.

To bring a successful free-speech retaliation claim, Plaintiff must show:

> (1) that [he] was engaged in constitutionally protected activity, (2) the defendant's actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity, and (3) the defendant's actions were substantially motivated as a response to [his] protected conduct.[95]

As explained above, Plaintiff's act of holding and displaying signs in the Library was not a constitutionally-protected activity because he did so in violation of the Library's Behavior and Free Speech Activities policies.  Because the undisputed facts show that Plaintiff was not engaged in constitutionally-protected activity, Defendants did not retaliate against him for exercising his constitutional rights.  The individual Defendants are therefore entitled to qualified immunity on the retaliation claim.

### 3.    Count 5: Equal Protection

In Count 5, Plaintiff contends that the individual Defendants discriminated against him when they called police to remove him—but not David Basten or Michael Eravi—from the Library for violating the Library's policies.  An equal protection claim ordinarily challenges

---

[95] *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1172 (10th Cir. 2021) (quoting *McBeth v. Himes*, 598 F.3d 708, 727 (10th Cir. 2010)).

"governmental action that disproportionally burdens certain classes of citizens."[96]  In *Village of Willowbrook v. Olech*, however, the Supreme Court carved out a successful "class-of-one" equal protection claim when a plaintiff shows that he "has been treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[97]  Plaintiff faces a heavy burden in making this claim, though, because he must show that others "'similarly situated in *every material respect*[,]' were treated differently."[98]

Plaintiff fails to show that he was similarly situated in every material respect to other speakers who displayed signs but did not have the Library policies enforced against them.  As explained above, Plaintiff omitted from the Pretrial Order facts that he now relies on to make out his equal protection claim.  Indeed, the only incident of unequal treatment mentioned in the Pretrial Order is the one with Eravi on November 25, 2024.  And for that reason alone, the Court need not consider Plaintiff's new factual allegations.  But even taking those additional facts into account, they do not demonstrate that Plaintiff was similarly situated to Basten during the December 1, 2024 incident or to Eravi on the November 25 or December 9 incidents.  As for Basten, Plaintiff explains that they were similarly situated because Basten entered the Library "carrying a paper with a message," and Plaintiff also entered "carrying his paper," yet Library staff called the police to remove Plaintiff for violating the Free Speech Activities Policy but not Basten.  But the record reflects a difference in the "papers" they held: Plaintiff's own affidavit explains that Basten displayed "a paper," while Plaintiff displayed a "piece of 22 x 28 inch

---

[96] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215–16 (10th Cir. 2011).

[97] 528 U.S. 562 (2000) (per curiam).

[98] *A.M. v. Holmes*, 830 F.3d 1123, 1167 (10th Cir. 2016) (quoting *Kan. Penn Gaming*, 656 F.3d at 1216).

cardboard."[99]  Basten and Plaintiff therefore chose different methods to communicate their message—a material difference in their situations.

Nor does Plaintiff show that he was similarly situated to Eravi.  As with Basten, Plaintiff and Eravi chose different methods of communication.  On November 25, Eravi held up a regular-sized 8.5 x 11 inch piece of paper; Plaintiff a larger 11 x 16 inch piece of paper.[100]  Those different sizes again show a material difference in whether each displayed and held a sign or not.  On December 9, Eravi draped a flag around his shoulders; Plaintiff held one out in front of him.  Library staff asked Plaintiff to take away his flag but not Eravi.  Again, the manner that each displayed the flag was materially different: one draped the flag around his shoulders as an ostensible article of clothing, while the other displayed the flag as a demonstration.  Plaintiff therefore fails to show a genuine factual dispute that he was similarly situated in every material respect to Basten and Eravi.

Even assuming that Plaintiff was similarly situated in every material respect as other speakers, he has failed to show that the individual Defendants lacked a rational basis in asking him to put away his sign but not others.  The individual Defendants need only have a rational basis for treating Plaintiff differently than those other speakers.[101]  As the Court explained above, the Library has a significant governmental interest in its Free Speech Activities Policy—avoiding disruptions to its patrons' access to and use of the Library.  The individual Defendants determined that Plaintiff's display of large signs and a flag violated the Library's Free Speech Activities Policy, while displaying a piece of paper and draping a flag around one's shoulders did not.

---

[99] Doc. 112-2 ¶ 47.

[100] *Id.* ¶ 42.

[101] *Holmes*, 830 F.3d at 1167 (quoting *SECSYS, LLC v. Vigil*, 666 F.3d 678, 688–89 (10th Cir. 2012)).

Addendum 25

In sum, Plaintiff fails to demonstrate that he was similarly situated to other speakers against whom the policies were not enforced in every material respect, nor does he show that the individual Defendants did not have a rational basis for treating Plaintiff different from other speakers.  Because Plaintiff fails to show Defendants violated his equal protection rights, the Court grants the individual Defendants summary judgment on their qualified immunity defense.

### C.    Official-Capacity Claims

Plaintiff brings the same claims against the Library's Board of Directors in their official capacity as he raises against the individual Defendants: (1) First Amendment content and viewpoint discrimination, (2) First Amendment retaliation, and (3) equal protection.  Under *Monell v. Department of Social Services of the City of New York*,[102] an injured plaintiff may hold a municipal entity liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."[103]  The claim has three general requirements: (1) an underlying injury to a constitutional right of the plaintiff; (2) a municipal policy or custom, and (3) a direct causal link between the policy or custom and the injury.[104]  "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."[105]

All of Plaintiff's remaining claims against the Library fail because the undisputed facts show that no Defendant inflicted an injury to his constitutional rights.[106]  Plaintiff's forum-status claim—Count 4—stumbles because the sign prohibitions are content-neutral speech restrictions

---

[102] 436 U.S. 658 (1978).

[103] *Id.* at 694.

[104] *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).

[105] *Feen v. City of Truth or Consequences*, 983 F.3d 1143, 1150 (10th Cir. 2020) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).

[106] *See id.* (quoting *Hinton*, 997 F.2d at 782).

Addendum 26

that survive intermediate scrutiny.  Plaintiff's retaliation claim fails because he was not engaged in constitutionally-protected activity.  And his equal protection claim founders because he failed to demonstrate that he was similarly situated in all material respects to other sign holders against whom the restrictions were not enforced, or that the individual Library Defendants lacked a rational basis for treating Plaintiff differently from other speakers.  Because Plaintiff did not suffer a constitutional injury, the Library is entitled to summary judgment on the official-capacity claims.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 108) is **granted** and Plaintiff's Motion for Partial Summary Judgment (Doc. 111) is **denied**.  The Clerk is directed to enter judgment in favor of Defendants and terminate this action.

**IT IS SO ORDERED.**

Dated: September 3, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

Addendum 28

# United States District Court

------------------------- **DISTRICT OF KANSAS**----------------------------

**JUSTIN SPIEHS,**

   **Plaintiff,**

**v.**       **Case No:  24-4016-JAR**

**KATHLEEN MORGAN, et al.,**

   **Defendants.**

## JUDGMENT IN A CIVIL CASE

☐ Jury Verdict.   This action came before the Court for a jury trial.  The issues have been tried and the jury has rendered its verdict.

☒ Decision by the Court.  This action came before the Court.  The issues have been considered and a decision has been rendered.

 **IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 108) is **granted** and Plaintiff's Motion for Partial Summary Judgment (Doc. 111) is **denied**.

 **IT IS SO ORDERED.**

Dated: September 3, 2025    SKYLER B. O'HARA
           CLERK OF THE DISTRICT COURT

           by:  _s/ Sarah Spegal_____
             Deputy Clerk

Addendum 28